**In re the Marriage of Larry D. BASS, Appellant,**

v.

**Ruth E. BASS, Appellee.**

**No. 49A02–0112–CV–826.**

Court of Appeals of Indiana.

Dec. 6, 2002.

Maxine T. Bennett, Indianapolis, IN, Attorney for Appellant.

Terry R. Curry, Sommer & Barnard, PC, Indianapolis, IN, Attorney for Appellee.

## OPINION

MATHIAS, Judge.

In a bifurcated proceeding, Ruth and Larry Bass's marriage was dissolved by the Marion Superior Court, and on May 7, 2001, the trial court entered a final decree addressing all property and child support issues. Larry filed a motion to correct error raising several issues, including his contention that the trial court misinterpreted the prenuptial agreement. Although the trial court then amended its final decree, Larry's motion to correct error was denied in almost every respect. Larry appeals raising nine issues, which we reorder and restate as:

I. Whether the trial court's finding that Larry put all assets in his name and treated them as business assets is supported by the evidence;

II. Whether the trial court erred when it calculated the equity in the marital residence;

III. Whether the trial court erred when it found that certain property was marital property, as opposed to premarital property;

IV. Whether the trial court erred when it determined that certain credit card debts owed by Ruth were marital debts;

V. Whether the trial court improperly awarded post-dissolution maintenance to Ruth;

VI. Whether the trial court misinterpreted the prenuptial agreement when it failed to give Larry a dollar-for-dollar credit against Ruth's cash award;

VII. Whether the trial court incorrectly calculated the cash award to Ruth with regard to the division of the marital property;

VIII. Whether the trial court erred when it calculated Larry's child support obligation; and,

IX. Whether the trial court abused its discretion when it ordered Larry to pay Ruth's attorney fees.

We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

### Facts and Procedural History

Ruth and Larry were married on February 14, 1991, and two children were born during the marriage. Prior to their marriage, Ruth and Larry executed a prenuptial agreement. During the marriage they jointly acquired certain marital assets, but did not co-mingle their personal property, as required by the agreement. During the marriage, Larry owned two businesses and paid all household expenses while Ruth worked part-time as a hair stylist.

In August, 1999, Ruth filed a petition for dissolution in the Marion Superior Court. Larry filed a counter-petition for dissolution, and Ruth voluntarily dismissed her petition, but was maintained on the record as "Petitioner."[1] A preliminary hearing was held, and the trial court entered a preliminary order on December 12, 1999. The order provided that Ruth was awarded temporary possession of the marital residence and custody of the children. Larry was ordered to pay the mortgage on the marital residence and utilities, to continue to make payments on a Ford Windstar van, and to maintain insurance on the van. He was also ordered to pay child support totaling $236 per week. Any uninsured medical expenses for the children were to be shared by the parties equally.

---

1. The parties' prenuptial agreement penalized the first party to file for dissolution.

Larry's child support obligation was later reduced to $212.40 per week.

A final hearing was held on December 11, 2000. At that hearing, pursuant to Larry's request, the trial court bifurcated the proceedings and dissolved the marriage. However, the trial court stated that all preliminary orders were to remain in effect until the remaining issues were resolved. The property division and child support issues were litigated at a second final hearing held on January 2, 2001.

The trial court entered a final decree on May 7, 2001. The trial court found that pursuant to the prenuptial agreement, Ruth was entitled to receive ten percent of Larry's non-business assets, and therefore, the trial court awarded $20,862.70 to Ruth. The trial court also made the following finding with regard to the prenuptial agreement:

7. The Court finds that the parties disagree as to the interpretation of the last full sentence of Paragraph B in Section IV, Page 4 of the parties' Prenuptial Agreement. The sentence in question is as follows: "If any court shall enter an order requiring payments of money or property for support, maintenance, alimony, or division of property upon the granting of a dissolution petition other than as provided herein, the obligations of perspective [sic] husband under this section shall be reduced on a dollar for dollar basis by the value of any money or property received by perspective wife pursuant to such court order." At the conclusion of the preliminary hearing on December 6, 1999, the Court ordered Larry to pay the mortgage payment and all utility payments at the marital residence and maintain full insurance coverage on Ruth's van and keep the payments current on her van. The Court finds these payments to be maintenance which Indiana law provides and which was not excluded pursuant to the Prenuptial Agreement. The Court further finds that in Section IV of the parties' Prenuptial Agreement, Ruth specifically agreed not to waive any rights to the provision of spousal support during the pendency of dissolution proceedings. The Court finds that since the parties agreed in their Prenuptial Agreement that spousal support during the pendency of the dissolution was permitted, that all payments made by Larry to Ruth pursuant to this court's December 6, 1999 Order should not be reduced on a dollar for dollar basis since the Court was in compliance with the parties' Prenuptial Agreement, Section IV.

Appellant's App. p. 14.

Ruth was also given possession of the marital residence, but Larry was awarded a lien against the residence in the amount of $7,295.50, which was one-half of the trial court's calculated value of the equity in the residence. When it calculated the equity in the marital residence, the trial court subtracted estimated roof repairs and other repairs to the house from the appraised value. Appellant's App. p. 17. The trial court then determined that certain property was accumulated during the marriage and was not covered by the prenuptial agreement. The total value of that divisible property was $74,914, and the trial court found that a 50/50 division of those assets was equitable. The trial court also determined that Ruth had accumulated credit card debts totaling $7,317.93 for household expenses and child-related expenses during the marriage and the period after the dissolution petition was filed, but before the preliminary order was in effect, and therefore, Larry was ordered to reimburse Ruth for those credit card obligations. Finally, the trial court ordered Larry to pay $398 per week for child sup-

port, in addition to $50 per week for the children's tutoring expenses.

On June 1, 2001, Larry filed a motion to correct error contesting many of the trial court's findings, alleging that 1) the trial court misinterpreted the prenuptial agreement; 2) the trial court miscalculated Larry's gross income; 3) the trial court's determination of the property included as marital assets was not supported by the evidence; and, 4) the trial court erred when it calculated the value of the equity in the marital residence.

On June 26, 2001, Larry filed a supplemental motion to correct error in which he stated that the trial court failed to designate to either party the responsibility to make payments on the Ford Windstar van awarded to Ruth. On November 6, 2001, the trial court issued an order vacating two of its findings of fact and ordering Ruth to make the payments on the van, but denied the remainder of Larry's motion to correct error. Larry now appeals. Additional facts will be provided as necessary.

## Standard of Review

■ The trial court entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A), which prohibits a reviewing court on appeal from setting aside the trial court's judgment pursuant to such findings and conclusions "unless clearly erroneous." "In our review, we first consider whether the evidence supports the factual findings. Second, we consider whether the findings support the judgment." *Menard, Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind.2000) (citations omitted). The trial court's judgment is " 'clearly erroneous only if (i) its findings of fact do not support its conclusions of law or (ii) its conclusions of law do not support its judgment.' " *Dunson v. Dunson*, 769 N.E.2d 1120, 1123 (Ind.2002) (quoting *Quillen v. Quillen*, 671 N.E.2d 98,

102 (Ind.1996)). Conclusions of law are reviewed de novo. *Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind.2002). Also, "[t]he court on appeal is to give due regard to 'the opportunity of the trial court to judge the credibility of the witnesses.' " *Dunson*, 769 N.E.2d at 1123 (quoting Ind. Trial R. 52(A)).

## I. The Trial Court's Finding that Larry Treated All Assets as Business Assets

■ Larry argues that the following finding was not supported by the evidence and implied that he was guilty of bad faith:

6. ... The Court finds that Larry was careful to put all assets in his individual name and treat it as "business assets."

Appellant's App. p. 13. This finding merely reflects the evidence presented at the hearing that Larry did not put any assets acquired during the marriage in Ruth's name, even those that were undisputedly marital assets, including the marital residence. Therefore, we hold that this finding is supported by the evidence.

## II. The Value of the Marital Residence

■ Larry next argues that the trial court erred when it calculated the value of the equity in the marital residence, and deducted the estimated cost of certain repairs to the house. With regard to the marital residence, the trial court made the following finding of fact:

12. The Court finds that the residence was appraised by Merrill Moores for $125,000 minus necessary repairs to the roof. The Court heard testimony from a roofer, Tim Schoonover, who testified that to repair the roof at 7241 Crest Lane, Indianapolis, Indiana, would entail tearing off the roof to see how much of the decking was damaged and that he would do the work for $11,774.00. Ruth

testified that there were other necessary repairs to the residence that totaled approximately $8,874.00. The Court finds that the mortgage balance on the marital residence as of the date of filing was $89,761.00. Therefore, the Court finds the net equity in the marital residence, minus the mortgage balance of $89,761.00 is $14,591.00. The court finds that one-half of that value is $7,295.50 and Larry's portion of the marital residence would be $7,295.50 and that Larry has a lien against said residence in that amount.

Appellant's App. p. 17. "The trial court has broad discretion in ascertaining the value of property in a dissolution action, and its valuation will not be disturbed absent an abuse of that discretion." *Hiser v. Hiser*, 692 N.E.2d 925, 927 (Ind.Ct.App. 1998).

At the final hearing, Larry testified that he was aware of the problems with the roof when the house was purchased. He also agreed that the estimated cost of repair to the roof should be subtracted from the appraised value of the house of $125,000. Tr. p. 78. Additionally, the appraisal noted that the damage to the roof appeared to be significant and the cost of repair should "come off the final value of this appraisal." Ex. Vol., Respondent's Ex. F. The only evidence admitted with regard to the cost of repair was the estimate of $11,774 prepared by Ruth's expert, Tim Schoonover. This evidence was sufficient to support the trial court's finding that the estimated cost to repair the roof of $11,774 should be subtracted from the appraised value of $125,000.

■ The trial court also found that an additional $8,874 for "other necessary repairs" should be deducted from the appraised value of the house. At the hearing, Ruth testified that after a home inspection, it was determined that other repairs to the marital residence were needed. She stated that she had an estimate of those repairs and guessed that the estimate was "something like $8,000." Tr. p. 130. However, the repairs were never specifically discussed and no estimate was introduced into evidence. We agree with Larry that this evidence is insufficient to support the trial court's finding that $8,874 should be deducted from the appraised value of the house for "necessary repairs." Therefore, the equity in the marital residence was $23,465, and on remand, the trial court should increase Larry's lien against the marital residence to the amount of $11,732.50.

### III. Pre–Marital Property v. Marital Property

■ Next, Larry argues that the trial court improperly labeled many of his premarital assets as marital property and improperly awarded them to Ruth despite the provision in the prenuptial agreement that provided that premarital property would be excluded from a property division in dissolution. Section Two of the prenuptial agreement provides:

Each of the parties hereto shall retain the title, management, and control of the property owned by each of them on the date of this Agreement or hereafter individually acquired whether real, personal, or mixed, and all increases or additions thereto, entirely free and unmolested by the other party, and may encumber, sell, dispose, give, or provide by will for the disposition of any or all such property so separately owned or possessed.

The relinquishment of claims and rights to this separate property, and the retention of title management and control of the property now owned by each of the parties hereto expressly includes

all property acquired after marriage by each party as proceeds or income from the property designated as separate property, any increase in value of separate property, or any property acquired after marriage in an individual capacity regardless of·source.

Appellant's App. p. 50.

The trial court found the following assets were not covered by the prenuptial agreement and were accumulated during the marriage:

| | |
|---|---|
| NCB checking account # 7710355483 | $ 1,099.00 |
| 1970 Quadrunner | 2,500.00 |
| 1994 GMC pick-up truck | 11,000.00 |
| 1988 Honda motorcycle | 615.00 |
| 1998 Ford Windstar | 7,225.00 |
| Ruger Magnum revolver | 220.00 |
| Smith & Wesson 9mm revolver | 220.00 |
| Household goods—Larry | 2,830.00 |
| Household goods—Ruth | 11,280.00 |
| NCB IRA Larry | 4,000.00 |
| NCB IRA Ruth | 4,000.00 |
| Ruth's beauty shop | 840.00 |
| Ruth's jewelry | 290.00 |
| Life Insurance: NWML | 28,795.00 |
| VL13053865–FV–$500,000.00 | |

Appellant's App. p. 18. The total value of these assets is $74,914 and the trial court found that a 50/50 division of the assets was equitable.

Larry contends that the following assets were improperly included as marital property: 1) 1994 GMC pick-up truck; 2) 1988 Honda motorcycle; 3) 1998 Ford Windstar; 4) Larry's IRA; 5). Ruger Magnum revolver; 6) Smith and Wesson revolver; 7) NCB checking account; and, 8) the life insurance policy. Larry also argues· that the trial court improperly valued the household goods. At the final hearing, Larry submitted an exhibit that listed all non-exempt marital assets, which included: 1) guns valued at $840, 2) 1998 Ford Windstar, 3) 1994 GMC pick-up truck, and 4) both his and Ruth's IRAs. Larry testified that these assets were acquired jointly during the marriage. Tr. p. 50. There-

fore, the trial court properly found the Ford Windstar, the pick-up truck, the revolvers, and Larry's IRA to be marital assets.

▮▮▮▮ The 1988 Honda motorcycle, checking account, and life insurance policy were not listed in the prenuptial agreement as premarital assets; however, Larry argues they are exempt because they were acquired during the marriage as his own personal property. Ruth argues that those items and the household goods were included in her exhibit listing all of the marital property and their values, which was admitted without objection, and therefore, the trial court properly included them as marital property and properly valued the household goods. *See* Ex. Vol., Petitioner's Ex. 27. We agree. Larry cannot now claim that the trial court improperly included those assets as marital property when he failed to raise the issue in the trial court.[2] The trial court has broad discretion in determining the value of property, and we will not reweigh the evidence or judge the credibility of witnesses in that regard. *See Crowley v. Crowley,* 708 N.E.2d 42, 54 (Ind.Ct.App.1999).

### IV. Credit Card Debts

▮▮▮ · Larry's next argument is that the trial court erred when it ordered him to pay Ruth's credit card debts because the prenuptial agreement "had relieved each party for any responsibility to pay any of [the] other party's separate debts, without regard to when they were incurred." Br. of Appellant at 25. Section Six of the prenuptial agreement provides:

Debts contracted by each party hereto prior to their marriage, or contracted subsequent to their marriage but con-

2. In his brief, in a footnote, Larry also argues that the trial court improperly valued the insurance policy. However, the only evidence presented to the trial court regarding the policy's value was the value listed on Ruth's exhibit.

tracted on or with respect to property held separate hereunder are to be paid by the party who shall have contracted the same, and the property of the other party shall not in any respect be liable for payment thereof.

Appellant's App. p. 52.

In its findings of fact, the trial court found that during the marriage, Ruth paid marital bills by paying for the expenses on her credit card and Larry would then reimburse her for those expenses. These expenses included household expenses, child-related items, the children's furniture, and household furniture. The trial court then stated:

> The Court finds that when Larry left the marital residence he left Ruth with all of her credit card bills and failed to reimburse [Ruth] any of those expenses for a period of months except for $100.00 per week for food for the children. Ruth had to obtain loans from friends to pay the previously incurred credit card obligations.... The Court finds that Larry had paid all household expenses and children's expenses on Ruth's credit card obligations in the past. Larry was not making any maintenance payments to Ruth, except for $100.00 per week for food for the children for five (5) months after Larry left the marital residence. Therefore, the Court finds Larry should pay to Ruth the sum of $7,317.93 to reimburse her for those credit card obligations within ten (10) days of the date of this Decree.

Appellant's App. pp. 19–20

At the final hearing, Ruth submitted the following exhibits concerning the credit card obligations: 1) a credit card statement which appears to be from People's Bank on which household expenses totaled $341.76, 2) a credit card statement from L. Fish Furniture with a balance of $2558, 3) a credit card statement from Country Visa

on which household expenses totaled $1260.16, 4) a second credit card statement from Country Visa on which household expenses totaled $1168.56, and 5) a billing statement and receipts from Lazarus indicating a balance of $2176.61, which Ruth testified were clothing purchases for the children. Ex. Vol., Petitioner's Exhibits 12, 13, 15, 16, 21; Tr. p. 155.

With regard to the Lazarus bill, Ruth testified that the purchases were back-to-school clothes for the children and Larry would typically buy the children school clothes each fall. Tr. p. 155. With the exception of the People's Bank credit card, all purchases on the credit cards were made during the marriage. The purchases on the People's Bank credit card were made for the benefit of the children before the preliminary order was entered. The purchases for the children's clothing on the Lazarus account were made in August, 1999, the same month that Ruth filed her petition for dissolution. The total amount of these credit card obligations is $7505.09. Ruth's testimony at trial was consistent with the trial court's finding that Ruth paid household expenses with credit cards, and Larry reimbursed her for those expenses. *See* Tr. pp. 141–42. This evidence supports the trial court's finding that the credit card obligations were marital debts that Larry typically paid, and therefore, the trial court did not err when it ordered him to pay $7,317.93.

## V. Improper Award of Maintenance

 Larry next argues that because the marriage was dissolved on December 11, 2000, after the trial court bifurcated the proceedings, he was no longer required to pay court-ordered spousal support to Ruth; therefore, any payments he was ordered to pay after that date constitute an improper award of maintenance. "Bifurcation is a process created by statute that allows a trial judge to complete a

dissolution in two separate phases." *Beard v. Beard,* 758 N.E.2d 1019, 1023 (Ind.Ct.App.2001), *trans. denied.* A dissolution action is not complete until the second phase is finished and a final decree is entered. *Id.* With regard to orders entered while the dissolution is pending, Indiana Code section 31–15–4–14 provides that "[a] provisional order terminates when: (1) the final decree is entered subject to right of appeal." Ind.Code § 31–15–4–14 (1998).

■ At trial, Larry requested that the trial court bifurcate the proceedings so that he could avoid a potentially more significant obligation to Ruth under the prenuptial agreement.[3] After the trial court granted Larry's request to bifurcate, the trial court stated that all preliminary orders would remain in full force and effect. Tr. p. 100. We agree with Ruth's argument that a "party who is awarded the relief he seeks from the court cannot thereafter assert error when the court grants his request." Br. of Appellee at 14. Furthermore, the dissolution action was not final until the trial court entered the appealable final decree on May 7, 2001, and the preliminary order remained in effect until that date. Therefore, any court-ordered spousal support Larry paid to Ruth before May 7, 2001, did not constitute an improper award of maintenance.

### VI. The Prenuptial Agreement

■ Larry's next argument is that the trial court misinterpreted the prenuptial agreement when it determined that the payments Larry made to Ruth as spousal support during the dissolution proceedings should not be reduced on a dollar-for-dollar basis against Ruth's cash award. Section Four of the prenuptial agreement provides:

If any court shall enter an order requiring payments of money or property for support, maintenance, alimony, or division of property upon the granting of the dissolution petition other than as provided herein, the obligations of Prospective Husband under this Section shall be reduced on a dollar for dollar basis by the value of any money or property received by Prospective Wife pursuant to such court order.

Appellant's App. p. 51. Ruth contends that "[t]he plain language of the provision is clearly only applicable if the Trial Court had awarded post-dissolution maintenance to Ruth." Br. of Appellee at 6.

In *Boetsma v. Boetsma,* 768 N.E.2d 1016 (Ind.Ct.App.2002), *trans. denied,* our court noted that

[a]ntenuptial agreements are legal contracts by which parties entering into a marriage relationship attempt to settle the interest of each party in the property of the other during the course of the marriage and upon its termination by death or other means. The interpretation of a contract is primarily a question of law for the court, even if the instrument contains an ambiguity needing resolution. Thus, on appeal, our standard of review is essentially the same as that employed by the trial court. Antenuptial agreements are to be construed according to principles applicable to the construction of contracts generally. If the language of the instrument is unambiguous, the intent of the parties must be determined from its four corners.

*Id.* at 1020 (internal citations omitted).

The language in the first paragraph of Section Four provides that the "parties hereto do not waive any right to the provi-

---

**3.** If Ruth and Larry were still married on February 14, 2001, Larry's obligation to Ruth under the agreement would have increased from 10% to 25% of his non-business assets.

sion of spousal support during the *pendency* of any dissolution proceedings." Appellant's App. p. 50 (emphasis added). In addition, Larry's argument is more than a bit disingenuous when, as discussed above, the dissolution proceedings were bifurcated and extended at his request and for his benefit. For all of these reasons, the trial court correctly interpreted the provision and was not required to give Larry a dollar-for-dollar credit for the spousal support he paid during the dissolution proceedings.

## VII. Calculation of Cash Award to Ruth

The trial court ordered Larry to pay $41,883.09 to Ruth pursuant to the property division. Larry argues that this amount was incorrectly calculated and was not adjusted after the trial court vacated two of its findings of fact pursuant to Larry's motion to correct error. In its findings of fact, the trial court ordered Larry to pay the following amounts to Ruth: 1) $20,862.70 pursuant to the terms of the prenuptial agreement; 2) $10,822 due to the marital property division; 3) $457.46 for the children's medical expenses; 4) $1,623 for the estimated repair to a sliding glass door in the marital residence damaged by Larry; 5) $690 of Ruth's 1999 tax liability; and 6) $7,317.93 for Ruth's credit card debts. These amounts total $41,773.09 and we assume the trial court made a clerical error when it ordered Larry to pay $41,883.09 as the findings of fact do not support an award in that amount. Also, the trial court vacated its findings with regard to the children's medical expenses and Ruth's 1999 tax liability. Therefore, we agree with Larry that the trial court's judgment in favor of Ruth of $41,883.09 is not supported by the findings. On remand, we order the trial court to enter a judgment in favor of Ruth in the amount of $40,625.63.

## VIII. Child Support

Larry argues that the trial court erred when it calculated his income and childcare expenses in establishing the amount of his child support obligation, and when it ordered him to pay the children's tutoring expenses. The trial court made the following finding with regard to child support:

9. The Court finds that, after review of Larry's 1999 individual income tax returns (as well as Schedule C which includes Larry's income from a business know as Edden Manufacturing Company) and the returns for his business known as Dealer's Transport, LTD, Larry's gross weekly income is $1,911.58. The Court finds that Ruth's total income from waitressing/bartending and hairstyling is $267.00 per week. The Court further finds that Ruth has a work-related childcare expense of $98.60, and Larry's portion of the children's health insurance premium is $8.99. Therefore, the Court finds that Larry's weekly child support obligation for his two children is $398.00.

Appellant's App. pp. 15–16. The trial court also ordered Larry to pay $50 per week to the children's tutor as long as tutoring is necessary. Appellant's App. p. 16.

### A. The Calculation of Larry's Income

Initially, we note that the calculation of a parent's income for child support purposes is more inclusive than for income tax purposes. *Clark v. Madden,* 725 N.E.2d 100, 107 (Ind.Ct.App.2000). "In particular, the trial court is vested with discretion regarding the validity of business expenses and deductions taken for tax purposes by a business owner." *Id.* "The income included for guidelines purposes is more inclusive than that reported for income tax purposes, because specifically excluded from 'ordinary and

necessary' expenses are depreciation, investment tax credits, and certain other business expenditures allowed by the IRS." *DeBoer v. DeBoer*, 669 N.E.2d 415, 424 (Ind.Ct.App.1996), *trans. denied* (citing *Haverstock v. Haverstock*, 599 N.E.2d 617, 620 (Ind.Ct.App.1992)). Indiana Child Support Guideline 3(A)(2) provides:

> 2. Self–Employment, Business Expenses, In–Kind Payments and Related Issues. Weekly Gross Income from self-employment, operation of a business, rent and royalties is defined as gross receipts minus ordinary and necessary expenses. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed to restrict the deductions to reasonable out-of-pocket expenditures necessary to produce income. These expenditures may include a reasonable yearly deduction for necessary capital expenditures. Weekly gross income from self-employment may differ from a determination of business income for tax purposes.

Larry argues that according to his 1999 tax returns, his total income was $68,479 for a weekly average of $1,316. However, excluded from his total income was a loss on the sale of a business property, which totaled $11,923. Adding the loss back into Larry's income, which is appropriate under the child support guidelines, Larry's total income becomes $80,402. Also from his income as a shareholder of Dealer's Transport, LTD, an S corporation, Larry deducted $19,000 as a depreciation expense. Adding that deduction into Larry's gross income, his total income in 1999 was $99,402, for a weekly gross income of $1,911.58, the amount the trial court based its support calculation upon. The trial court did not abuse its discretion in this regard.

### B. *Childcare Expenses*

■ Larry also argues that the trial court erred when it calculated the childcare expenses at $98 per week. At the final hearing, the children's babysitter, Sharon Hall, testified that she watches the children every Tuesday and Thursday and every other Saturday. Ms. Hall charges $20 per day during the week, and $40 per day during the weekend. Tr. pp. 13–14. Although Ruth listed the work-related childcare expense on her child support worksheet as $98.60, aside from Ms. Hall's testimony, there is no other evidence in the record regarding childcare expenses. Therefore, the trial court erred when it determined that the childcare expenses were $98 per week where the evidence established that they averaged $60 per week.

### C. *Tutoring Expenses*

■ Larry also contends that the trial court erred when it made the following finding of fact:

> 10. The Court heard testimony from the children's babysitter and tutor, Sharon Hall, and finds that it would be in the children's best interests to continue the tutoring with Sharon Hall and that Larry be ordered to pay $50.00 per week to Sharon Hall for the children's tutoring as long as tutoring is necessary as determined by Sharon Hall, the children's teachers, and/or Ruth.

Appellant's App. p. 16. The children's babysitter, Ms. Hall, who is a former teacher, is also their tutor. At the final hearing, Ms. Hall testified that both of the children are very bright, but need extra assistance to get their schoolwork completed, and she reviews their homework with them. She testified that their schoolwork has improved greatly since she started tutoring them. Tr. pp. 17–18.

In addition to the basic child support obligations, trial courts may order additional support for extraordinary educational expenses. *See* Ind. Child Support Guideline 3(E)(4) (1996 & Supp.2002). To assist courts in establishing child support obligations, the following additional commentary has been provided with regard to extraordinary educational expense:

The data upon which the Guideline schedules are based include a component for ordinary educational expenses. Any extraordinary education expenses incurred on behalf of a child shall be considered apart from the total basic child support obligation.

Extraordinary educational expenses may be for elementary, secondary or post-secondary education, and should be limited to reasonable and necessary expenses for attending private or special schools, ... to meet the particular educational needs of the child.

Ind. Child Support Guideline 6, Additional Commentary (1996 & Supp.2002). The commentary does not expressly allow trial courts to order parents to pay for tutoring in addition to the basic child support obligation. However, the commentary to Guideline 1 states that there is room for flexibility in the application of the Guidelines and the "Guidelines are not immutable, black letter law." Ind. Child Support Guideline 1, Commentary (1996 & Supp. 2002). *See also Talarico v. Smithson*, 579 N.E.2d 671, 673 (Ind.Ct.App.1991).

Before the Guidelines were adopted, our court contemplated that tutoring was an appropriate additional expense for which a parent could be obligated to pay. *See Green v. Green*, 447 N.E.2d 605, 610 (Ind.Ct.App.1983). Therefore, although tutoring is not listed above as an example of an extraordinary educational expense, we hold that trial courts may order a parent to pay additional support for tutoring if the evidence demonstrates a particular educational need for such additional assistance. The evidence in this case establishes that the children have benefited from the tutoring provided by Ms. Hall and the trial court's finding articulated a sufficient basis for deviating from the Child Support Guidelines.

## IX. Attorney Fees

Finally, Larry argues that the trial court abused its discretion when it ordered him to pay Ruth's attorney fees. The trial court has statutory authority to order a party to pay reasonable attorney fees for the opposing party pursuant to Indiana Code section 31–15–10–1. The trial court enjoys broad discretion in assessing attorney fees in dissolution cases. *Russell v. Russell*, 693 N.E.2d 980, 984 (Ind.Ct.App.1998), *trans. denied.*

In deciding whether to award attorney fees, the trial court should consider the resources of the parties, their economic condition, their ability to engage in gainful employment and to earn adequate income, and any other factors that bear on the reasonableness of the award. *Hanson v. Spolnik*, 685 N.E.2d 71, 80 (Ind.Ct.App. 1997), *trans. denied.* "Misconduct that directly results in additional litigation expenses may properly be taken into account in the trial court's decision to award attorney fees in the context of a dissolution proceeding." *Lewis v. Lewis*, 638 N.E.2d 859, 861 (Ind.Ct.App.1994).

The evidence presented at the final hearing supports the trial court's award of attorney fees to Ruth. Larry's income greatly exceeds Ruth's. Also, Larry failed to follow court orders at numerous times during the proceedings. The trial court found that Larry 1) was not in compliance with court orders and as a result Ruth filed three Rules to Show Cause; 2) contrary to court order, Larry removed Ruth

from his health insurance during the dissolution proceedings; and, 3) Larry failed to pay child support pursuant to court order. Appellant's App. pp. 14–15. Larry attempts to argue that Ruth's attorney fees are not a marital debt, but a separate debt, and therefore, under the prenuptial agreement, Larry is not obligated to pay her attorney fees. However, the prenuptial agreement does not specifically reference payment of attorney fees during dissolution, and by statute, the trial court has the discretion to award fees. *See* Ind.Code § 31–15–10–1 (1998). Furthermore, at the final hearing, Larry sought an award of attorney fees from the trial court. Under these facts and circumstances, the trial court did not abuse its discretion when it awarded attorney fees to Ruth.

### Conclusion

The trial court's findings of fact challenged by Larry in this appeal were all supported by the evidence except with regard to 1) the trial court's finding that $8,874 for estimated repairs should be subtracted from the equity in the marital residence; 2) the trial court's entry of judgment in favor of Ruth in the amount of $41,883.09, which was not supported by the findings and should be reduced to $40,625.63; and 3) the trial court's finding that the weekly work-related child care expense was $98, which was not supported by the evidence that established a work-related childcare expense of only $60 per week. The spousal support payments Larry was ordered to make to Ruth until the final decree was entered did not constitute an improper award of post-dissolution maintenance to Ruth, and the trial court correctly interpreted the prenuptial agreement. Finally, the trial court did not abuse its discretion when it awarded attorney fees to Ruth.

Affirmed in part, reversed in part and remanded for proceedings consistent with this opinion.

BAILEY, J., concurs.

SULLIVAN, J., concurs in result as to Issue I, and concurs in all other issues.