**SEQUA COATINGS CORPORATION,**
**Appellant–Cross–Claim**
**Defendant,**

v.

**NORTHERN INDIANA COMMUTER**
**TRANSPORTATION DISTRICT,**
**Appellee–Cross–Claim Plaintiff.**

No. 64A05–0305–CV–248.

Court of Appeals of Indiana.

Oct. 9, 2003.

George T. Patton, Jr., Theresa M. Ringle, Bose McKinney & Evans, LLP, Indianapolis, IN, Michael D. Sears, Jason M. Massaro, Singleton Crist Austgen & Sears, Munster, IN, Attorneys for Appellant.

Michael C. Harris, Charles F.G. Parkinson, Harris Welsh & Lukmann, Chesterton, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Sequa Coatings Corporation ("Sequa") appeals the trial court's denial of its motion for summary judgment and entry of summary judgment in favor of Northern Indiana Commuter Transportation District ("NICTD"). We affirm.[1]

### Issues

Sequa raises two issues, which we restate as:

I. whether the trial court properly concluded that the indemnity clause in the parties' agreement does not violate public policy and denied its motion for summary judgment; and

II. whether the trial court properly granted NICTD's motion for summary judgment.

### Facts

NICTD, a municipal corporation, operates a commuter passenger train in northern Indiana, and Sequa is a company that applies coatings to coiled steel and aluminum. Sequa was interested in building a facility in a location with limited access, which required crossing NICTD's railroad tracks. This crossing was known as Midwest Crossing. Midwest Crossing consisted of two railroad tracks owned and operated by Conrail and two railroad tracks owned and operated by NICTD. The Conrail and NICTD tracks were separated by fifty-eight feet of paved roadway. Traffic across Midwest Crossing was limited to those doing business with the various businesses located on the northern side of the tracks and was controlled by flashing lights and crossing gates.

On October 17, 1995, after engaging in lengthy negotiations, covering a period of approximately six months, NICTD and Sequa entered into an agreement allowing Sequa employees, visitors, customers, and suppliers to cross NICTD's railroad tracks. Pursuant to the agreement, Sequa was permitted to use and was required to maintain Midwest Crossing. Sequa was also required to pay for signs stating "No Trespassing," "Private Crossing—Use at Own Risk," and "Crossing Restricted to Use by Sequa's Employees, Visitors, Customers, and Suppliers." Appellant's App p. 110. The agreement also provided in part:

*25. Indemnity*

(a) It is understood by all parties that [NICTD's] operations at or near the Crossings and other property associated with this Agreement involve some risk, and Sequa as part of the consideration for this Agreement releases and waives any right to ask for or demand damages

---

1. We hereby deny Sequa's request for oral argument.

for or on account of the loss of or damage to the Crossings, including the loss of or interference with service or use of the Crossings and irrespective of whether such loss or interference is attributable to the fault, failure or negligence of [NICTD] or others.

(b) The phrase "Loss or Damage" as used within this Agreement shall be interpreted by the parties to include any and all loss of, damage to, or destruction of any real property, personal property, or environment, including without limitation, damage to or destruction of land, air, water, wildlife, or vegetation, and irrespective of whether the damaged or destroyed property is owned or otherwise possessed by [NICTD], Sequa, or a third party, and injury to or death of any person or persons whomsoever, including, without limitation, the parties to this Agreement, their agents, employees, customers, visitors, suppliers, and any and all non-parties who use, occupy, or otherwise utilize the assets associated with, or participate in the activities arising out of, this Agreement.

(c) The phrase "Claims, Settlements, Litigation, and Related Expenses" shall include any and all losses, damages, costs, payments, and expenses of every kind and nature, including reasonable attorney fees and disbursements, incurred by or attributable to [NICTD], other railroad parties lawfully utilizing [NICTD's] assets, and their respective agents, subcontractors, successors, officers, and assigns as a result of claims, demands, actions, suits, proceedings, judgments or settlements arising out of, in whole or in part, or in any way connected with the Crossings, the subject matter of any indemnity provision of this Agreement, or the activities of Sequa, its agents and its subcontractors at or near said Crossings.

(d) The phrase "Causes of Action" shall include all claims, settlements, litigation, and related matters associated with or arising under this Agreement, whether rightfully or wrongfully made, to include, but not limited to, Claims, Settlements, Litigation, and Related Expenses associated with and Loss or Damage arising from the construction, operation, maintenance, use and removal of any assets associated with this Agreement, or the property authorized for use by this Agreement, as well as matters associated with or arising under various workers compensation laws, the Indiana Tort Claims Act, the Federal Employees Liability Act, various federal and state environmental statutes, and any other federal or state laws or regulations applicable to the construction, operation, maintenance, use, and removal of any assets associated with this Agreement including, but not limited to, the Crossings. The foregoing examples are only partially illustrative of the types of Causes of action contemplated for coverage by this Agreement, it being the *parties' mutual intent to include within the scope of the indemnification afforded under this Agreement a full, complete, comprehensive and unconditional grant of indemnity from Sequa to [NICTD] with respect to any and all potential exposures risked by [NICTD] resulting from or arising out of this Agreement.*

\* \* \* \* \*

(f) Sequa shall hold harmless, defend, and indemnify [NICTD], other railroad parties lawfully using [NICTD's] assets, and [NICTD's] agents, employees, officials, and governing boards from any and all Causes of Action, as defined above, asserted by any parties and non-parties to this Agreement, including, but not limited to, any Causes of Action for

Loss or Damage due to negligence, misconduct, malfeasance, or misfeasance by [NICTD] resulting from or arising out of any aspect of [NICTD's] participation in this Agreement, included, but not limited to, any Cause of Action, in any way related to or associated with, or on account of, the construction, placement, attachment, presence, use, maintenance, repair, alteration, renewal, or relocation, of the Crossings, whether such Loss or Damage be suffered or sustained by [NICTD] directly or by its employees, patrons, or other persons or corporations, including Sequa, its employees, contractors, subcontractors, agents, visitors, customers, or suppliers who may seek to hold [NICTD] liable, and irrespective of whether said Causes of Action are caused by or resulting from, in whole or in part, the activities of [NICTD], the other railroad parties lawfully using [NICTD's] assets, or their respective agents, directors, employees, officials, or governing boards. Said defense and indemnification shall include, and is not limited to, reimbursement of [NICTD] for its Claims, Settlements, Litigation, and Related Expenses, which may be imposed upon, incurred by, or asserted against [NICTD] or for which [NICTD] may be held or become liable. . . .

Appellant's App. pp. 118–20 (emphasis added).

On June 18, 1998, a semi pulling two trailers, also referred to as a "Michigan train," was delivering three steel coils to Sequa. The Michigan train was neither owned nor operated by Sequa. The Michigan train crossed the first set of railroad tracks, owned by NICTD, and stopped for a passing train on Conrail's tracks. The fifty-eight foot area between the two sets of tracks was insufficient to allow the eighty-two foot long truck and trailer combination to clear NICTD's railroad tracks, and the second trailer remained stopped on the railroad tracks. While the truck driver waited for the train on Conrail's tracks to pass, he observed NICTD's railroad crossing gate descend and the warning lights begin to flash. Aware that a NICTD train was approaching, the truck driver attempted to turn the truck to the left and off the tracks. The truck driver was unable to move the truck off the tracks and the NICTD train struck the second trailer. Upon colliding, the second trailer broke away from the first trailer and was pushed by the front of the train. The steel coil on the second trailer was secured by a single chain that broke, allowing the nineteen-ton coil to enter the train and to move to the passenger compartment. As a result of the accident, three of the train's passengers were killed.

On October 29, 1999, the decedents' estates filed a complaint. On May 6, 2003, the decedents' estates filed an amended complaint naming seventeen individuals and corporations as defendants; both NICTD and Sequa were named as defendants. NICTD filed a cross-claim against Sequa alleging that Sequa had breached the parties' indemnification agreement. On January 9, 2002, NICTD filed a motion for summary judgment against Sequa. On March 25, 2002, Sequa filed a cross-motion for summary judgment. On December 19, 2002, the trial court held a hearing on the motions. On February 7, 2003, the trial court granted NICTD's motion for summary judgment and denied Sequa's. On March 10, 2003, Sequa filed a motion to reconsider and a renewed motion for summary judgment and designated additional evidence in support of this motion. On April 4, 2003, at a status conference, the trial court addressed Sequa's motion and indicated that it was "basically the same as the previous motion." Tr. p. 8. The trial court denied Sequa's motion and made its

earlier order on the parties' summary judgment motions a final appealable order. Sequa now appeals.

## Analysis

### Standard of Review

"The trial court's decision on summary judgment enters appellate review clothed with a presumption of validity." *Malone v. Basey*, 770 N.E.2d 846, 850 (Ind.Ct.App. 2002), *trans. denied.* Nevertheless, summary judgment is appropriate only when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). "Relying upon specifically designated evidence, the moving party bears the burden with regard to these two components." *KPMG, Peat Marwick, LLP v. Carmel Financial Corp.*, 784 N.E.2d 1057, 1059 (Ind.Ct.App.2003).

If the moving party meets these two requirements, the burden shifts to the non-movant to set forth specifically designated facts showing that there are genuine issues for trial. *Id.* at 1059–60. Genuine issues of material fact exist where facts concerning an issue that would dispose of the litigation are in dispute or where the undisputed material facts are capable of supporting conflicting inferences on such an issue. *Id.* at 1060. Cross motions for summary judgment do not alter this standard. *Id.*

On appeal, we are bound by the same standard as the trial court, and we only consider the evidence designated to the trial court. *Id.* "We liberally construe all designated evidentiary material in the light most favorable to the non-moving party to determine whether there is a genuine issue of material fact." *Id.* The appealing party has the burden of persuading us that the trial court erred. *Id.*

With regard to the designated evidence, NICTD asserts that Sequa repeatedly relies on evidence not designated by either party prior to the trial court's February 7, 2003 order. NICTD contends that the additional designated evidence presented with Sequa's motion to reconsider and renewed motion for summary judgment was simply an attempt to " 'pad the record' on appeal." Appellee's Br. p. 16.

Sequa responds that it properly designated additional evidence because it filed a motion to reconsider, and "[i]n seeking reconsideration, Sequa designated evidence contrary to the trial court's Order which was the first opportunity to correct the trial court's mistaken impressions." Appellant's Reply Br. pp. 4–5. Sequa argues that it was permissible to seek reconsideration based on the newly designated evidence because the trial court's order was not final as to all issues and parties. Sequa relies on *Bethlehem Steel Corp. v. Conrail*, 740 N.E.2d 900, 905 (Ind.Ct.App. 2000), *trans. denied,* in which we concluded that the appellant sufficiently preserved the issue of whether the trial court erroneously granted partial summary judgment where it provided record citations and separate appendices specifically identifying certain materials in its motion opposing partial summary judgment. *Id.*

*Bethlehem* merely addressed the sufficiency of the manner in which evidence supporting a motion in opposition to partial summary judgment was designated. Neither party in *Bethlehem* filed a motion for reconsideration or a renewed motion for summary judgment, as is the issue here. *See id.* Further, nothing in our reading of *Bethlehem* supports Sequa's assertion that its newly designated evidence is available for our consideration on appeal. Accordingly, *Bethlehem* is inapposite to our consideration of this case.

▮ Upon close review of Sequa's motion for reconsideration and renewed motion for summary judgment, we also

conclude that consideration of its newly designated evidence would be inappropriate given the facts of this case. First, Sequa's motion raises no new issues and restates many of the issues raised in opposition to NICTD's motion for summary judgment and its cross motion for summary judgment. Second, the designated evidence was not newly discovered evidence and was not otherwise unavailable prior to the trial court's February 7, 2003 order. Third, Sequa filed its motion on March 10, 2003, and the trial court ruled on it following a status conference on April 4, 2003, at which the trial court indicated that it was unnecessary for NICTD to respond to Sequa's motion. Thus, NICTD was not given the proper opportunity to respond to the motion.

Moreover, we find no merit to Sequa's claim that it was entitled to file newly designated evidence because the parties' motions were partial motions for summary judgment. Although the issues may not have been final for appeal purposes, the trial court's February 7, 2003 order completely disposed of the parties' indemnity issues. Further, we remain unconvinced that Sequa should have been able to correct the trial court's "mistaken impressions" with newly designated evidence that was discoverable and could have been made available to the trial court before it issued its order. Thus, we will not consider Sequa's newly designated evidence on appeal because to do so would essentially give Sequa a second bite at the apple.

## I. Sequa's Summary Judgment Motion

Sequa first argues that the trial court erred in denying its summary judgment motion, which alleged that the parties' agreement was unenforceable because the indemnity clause was void as against public policy. Generally, in the absence of legislation to the contrary, parties to a contract are free to modify the duties that they owe each other as a matter of law. *Fresh Cut, Inc. v. Fazli*, 630 N.E.2d 575, 578 (Ind.Ct.App.1994), *vacated in part on other grounds*.

In Indiana, the parties may agree to cover the risk of harm which may be sustained by third persons by agreeing through an indemnity clause to shift the financial burden from the indemnitee to the indemnitor. As a general rule, indemnification clauses are not void against public policy, though they will be strictly construed and the intent to indemnify the indemnitee for its own negligence must be stated in clear and unequivocal terms. An indemnification clause in a lease is not void or voidable as against public policy simply because the indemnitee is charged with a nondelegable duty to the public or third persons. In its role as lessor, an indemnitee may rightfully demand as part of the consideration for the lease that its lessee bear the entire financial burden, particularly when the lessee contributes to the risk of loss.

*Id.* Sequa claims that the indemnity clause is unenforceable because at the time of the accident, NICTD was acting as a common carrier.[2] NICTD responds that the indemnity clause is valid because Sequa was not a user of NICTD's common carrier services. The trial court agreed with NICTD and concluded that because Sequa was not a user of NICTD's common carrier services, the indemnity clause was not void as against public policy.

---

**2.** A common carrier is defined as "[a] carrier that is required by law to transport passengers or freight, without refusal, if the approved fare or charge is paid." Black's Law Dictionary, 205 (7th ed.1999).

Both parties cite heavily to *Pennsylvania R.R. Co. v. Kent,* 136 Ind.App. 551, 198 N.E.2d 615 (1964), *trans. denied.* In *Kent,* an employee of Kent, who leased land from Pennsylvania Railroad, was injured as the result of Pennsylvania Railroad's sole negligence. *Id.* at 558, 198 N.E.2d at 616. The Pennsylvania Railroad denied liability to the employee because its lease agreement with Kent required Kent to indemnify it from all damages and expenses. *Id.,* 198 N.E.2d at 616. On appeal, we considered the "extent, scope and legal enforceability of the indemnification clause of the real estate contract . . . ." *Id.* at 556, 198 N.E.2d. at 617.

We emphasized that the employee's injuries were "the result of the railroad's own negligence created by its own employees, and who at the time and place were solely under the orders, control and directions of said railroad company." *Id.* at 559, 198 N.E.2d at 619. We observed:

> a railroad company when called upon to perform a service which it is not compelled to perform by the very nature of its operation as a common carrier, may, under proper conditions, contract against liability for negligence for the reason that it is then acting in the capacity of a private carrier. Further, we believe the rule to be well established that a railway company acting as a common carrier may not contract for indemnity against its own tort liability when it is performing either a public or quasi public duty such as that owing to a shipper, passenger, or servant, and that such contracts are void as against public policy.

*Id.* at 560, 198 N.E.2d at 619 (citations and emphasis omitted). We then rejected Pennsylvania Railroad's argument that in executing the lease contract with Kent, it was acting in its private capacity, permitting it to seek indemnification for its negligence. We concluded that Pennsylvania Railroad:

> by the simple device of the execution of a real estate contract, could not change the character of its operation from that of a common carrier to that of a private carrier. Therefore in our opinion it does not necessarily follow, as a matter of law, that in so doing the appellant changed the character of its operation to that of a private carrier.

*Id.* at 563, 198 N.E.2d at 620.

In determining whether Pennsylvania Railroad was actually acting as a common carrier, we recognized that the railroad was transporting products over its own road and upon its own right of way and that it "had complete, undivided, and unrestricted management, control and direction of every element that entered into its operation . . . including the road right of way, its own cars, locomotives and all employees connected with the operation of such train." *Id.* at 564, 198 N.E.2d at 621. We concluded that Pennsylvania Railroad was responsible for and had the power to control and guard against every element of negligence that might expose the employee to dangers, which might have been avoided by the exercise of due care. *Id.,* 198 N.E.2d at 621. Further, when such indemnity agreements "may result in affecting the public interest and thereby contravene public policy, the abrogation of the rules governing common carriers must be zealously guarded against." *Id.* at 567, 198 N.E.2d at 622.

Our supreme court denied transfer but also issued an opinion, which provided in part:

> The opinion of the Appellate Court should be construed as denying the right of a common carrier to make indemnifying contracts against its own torts or negligence in its common carrying services *only with those using such ser-*

*vices,* and it further should not be construed as prohibiting a common carrier from entering into insurance contracts with duly licensed insurance companies to indemnify it against its losses.

Upon such interpretation, the petition to transfer is denied.

*Pennsylvania R.R. Co. v. Kent,* 246 Ind. 101, 102, 202 N.E.2d 893, 893–94 (1964) (emphasis added).

The case before us today involves neither an indemnification clause between NICTD and those using its common carrier services nor an indemnification clause between NICTD and a duly licensed insurance company. Instead, the facts of this case are unique, and not in either of those categories. Most importantly, the facts before us are distinguishable from those in *Kent* because this clearly was not a situation in which NICTD "had complete, undivided, and unrestricted management, control and direction of every element that entered into its operation . . . including the road right of way, its own cars, locomotives and all employees connected with the operation of such train." *Kent,* 136 Ind. App. at 564, 198 N.E.2d at 621. Specifically, and to the contrary, Sequa had a right-of-way permitting its employees, visitors, customers, and suppliers to access its facility via Midwest Crossing. Because the semi truck delivering the coils to Sequa was lawfully utilizing the right-of-way granted to Sequa, this is not a situation in which NICTD had exclusive ability to prevent the negligence that caused the accident.

We are guided by a factually similar case, *Penn Cent. Co. v. Youngstown Sheet & Tube Co.,* 146 Ind.App. 216, 218–19, 253 N.E.2d 704, 706 (1969), in which we addressed the enforceability of an indemnity clause where a motorist was crossing a railroad track in his automobile when he was struck and injured by a train owned by Youngstown and operated on tracks owned by Penn Central. The motorist sued both companies, and Penn Central sought to enforce the indemnity clause of a contract with Youngstown, which relieved Penn Central from its financial responsibilities if it was not solely negligent. *Id.* at 220–23, 253 N.E.2d at 706–08. Youngstown, relying on *Kent,* asserted that Penn Central was a common carrier and could not contract away its liability for a non-delegable duty owed to the public. *Id.,* 253 N.E.2d at 707. We first recognized that Penn Central had a duty to use due care to protect motorists at crossings, which could not be delegated.[3]

Recognizing the difficulties associated with attempting to classify Penn Central as either a common carrier or a private carrier, we examined the underlying reasons for such classifications. *Id.,* 253 N.E.2d at 707. We first considered whether the motorist's right to recover was in any way impaired by the contract. *Id.,* 253 N.E.2d at 707. We concluded that the motorist was free to sue both parties and obtain a judgment enforceable against either or both defendants. *Id.* at 221–22, 253 N.E.2d at 707. We further noted that because the motorist was not a party to the contract he need not be bothered with its application. *Id.* at 222, 253 N.E.2d at 707. We also considered the effect of the contract on the protection of the general public at railroad crossings. We asked:

---

**3.** We note Sequa asserts that, like Penn Central, NICTD owed a non-delegable duty to protect the public and motorists who crossed its railroad tracks. It does not appear, however, that Sequa raised this issue before the trial court. To the extent that this issue was not properly raised before the trial court, it is waived. *See Bass v. Bass,* 779 N.E.2d 582, 590 (Ind.Ct.App.2002), *trans. denied.* It is necessary to address this issue to some degree, however, to determine whether the indemnity clause is enforceable.

Will Penn Central be induced to ignore the safety responsibilities it alone bears because it will not be financially responsible for the results if the following contingencies occur: (1) That the negligence of Penn Central is not the sole legal cause of the accident, and (2) That a train made up, run and controlled by Youngstown legally contributes to the cause of the mishap?

*Id.*, 253 N.E.2d at 707. In answering this question, we relied on our supreme court's opinion denying transfer in *Kent.* We concluded that Penn Central would not be induced to ignore its safety responsibilities anymore than negligent driving is induced from insured motorists. *Id.*, 253 N.E.2d at 708. Further, we noted that the parties' agreement only relieved Penn Central from its financial responsibilities if it is not the sole cause of the accident, and that as a lessor, Penn Central may rightfully demand that the lessee bear the entire burden of negligence that it contributes to as part of its consideration for the lease. *Id.* at 222–23, 253 N.E.2d at 708. We concluded that the indemnity clause of the parties' agreement was enforceable. *Id.*, 253 N.E.2d at 708.

In addressing the first question, the decedents' estates here were free to sue both NICTD and Sequa. They did. Like the motorist in *Penn Central,* the decedents' estates may also obtain a judgment that is enforceable against either or both defendants. In this regard, the plaintiffs' rights to recover are not impaired by the agreement.

With regard to the second question, unlike in *Penn Central,* the parties' indemnity clause did not limit Sequa's obligation only to cases where NICTD is not the sole cause of the negligence. However, in their complaint, the decedents' estates allege that the negligence of numerous defendants contributed to the accident. Further, a determination of negligence has not yet been made, and given the facts of this case, it is unlikely that NICTD's negligence was the sole cause of the accident as a matter of law.[4] We decline to speculate as to the enforceability of the parties' indemnity clause in a situation in which NICTD's negligence was the sole cause of the accident, and do not address that specific circumstance.

Further, this is not a situation in which Sequa had no involvement in events leading up to and causing the accident. Sequa entered into a contract with NICTD pursuant to which NICTD granted Sequa a right-of-way across its railroad tracks. In consideration for this right-of-way, Sequa agreed to indemnify NICTD for loss associated with Midwest Crossing. Thus, like *Penn Central,* we conclude that NICTD would not be induced to ignore its safety responsibilities merely because its agreement with Sequa contained an indemnity clause any more than negligent driving is induced from motorists carrying auto insurance. *See id.*

We are also guided by the reasoning in an early common carrier case, *Ohio & Mississippi Railway Co. v. Selby,* 47 Ind. 471, 490 (1874). In that case, our supreme court considered the policy against allow-

4. Although Sequa failed to include the entire National Transportation Safety Board ("NTSB") accident report in its Appendix, a letter from NICTD's counsel to Sequa's counsel summarizes the report. The report apparently attributed the cause of the accident to the truck driver. Appellant's App. p. 357. The report indicated that the truck driver was operating the truck without a permit and had used marijuana prior to the accident. *Id.* The report also indicated that the truck's load was 70,000 pounds over weight, the operation of a Michigan train was in violation of Indiana law, the trailer was not properly lit, and the load was improperly secured with only a single chain. *Id.*

ing railroads acting as common carriers to shift the liability for their negligence to their passengers and recognized, "[t]he [passenger railroad] business is mostly concentrated in a few powerful corporations, whose position . . . enables them to control it. They do, in fact, control it, and impose such conditions upon travel and transportation as they see fit, which the public is compelled to accept." *Id.*

This is not a situation in which NICTD's passengers were required to accept NICTD's terms of indemnification before they would be permitted to travel on the train. Instead, Sequa, a well-informed, and presumably a well legally represented, corporation, entered into its agreement with NICTD when it purchased the facility, access to which is limited to Midwest Crossing. In exchange for a right-of-way, Sequa agreed to indemnify NICTD for loss associated with Midwest Crossing. Thus, it appears that the historic public policy concerns for the common carrier exception do not exist in the facts of this case.

This is a situation in which NICTD entered into an agreement with Sequa, who was acting more like an insurer than a passenger or motorist. Sequa agreed to the indemnification clause of the agreement as part of its consideration for the right-of-way across Midwest Crossing. We cannot conclude that this indemnity clause will induce NICTD to ignore its safety responsibilities any more than its insurance coverage from an insurance carrier does. Because Sequa has not established that it is entitled to judgment as a matter of law, the trial court did not err in denying Sequa's motion for summary judgment on this issue.

## II. NICTD's Motion for Summary Judgment

Sequa contends that the trial court automatically granted NICTD's motion for summary because it denied Sequa's motion for summary judgment. Sequa asserts that the trial court failed to construe the designated evidence in the light most favorable to it when the trial court granted NICTD's motion. In reviewing Sequa's claims, we first observe, "Once the moving party has met its burden of proving that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law, the opponent must respond by setting forth specific facts showing a genuine issue for trial, and may not simply rest on the allegations contained in the pleadings." *Hedrick v. Tabbert,* 722 N.E.2d 1269, 1271 (Ind.Ct.App.2000). At the time of filing the response, the opponent shall designate to the trial court all parts of the evidentiary materials upon which it relies for purposes of the motion. *Id.* Additionally, Indiana Trial Rule 56(E) provides in part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, *shall* be entered against him.

(Emphasis added).

In its response to NICTD's motion for summary judgment, Sequa raised several objections. Sequa, however, did not designate any evidence in support of those objections. Instead, Sequa filed a cross-motion for summary judgment, addressing issues similar to those raised in its response and designating evidence specifically supporting its cross-motion. Because Sequa failed to set forth specific facts showing genuine issues of material fact supported by designated evidence in its

response, the trial court properly entered judgment against Sequa on NICTD's motion for summary judgment. *See* T.R. 56(E).

This distinction is significant because if we were to address Sequa's claim as it requested, we would construe the facts in the light most favorable to Sequa, the non-moving party. *See KPMG,* 784 N.E.2d at 1060. However, because Sequa did not sufficiently raise its objections in its response we will address them as they are raised in its cross-motion for summary judgment, which requires us to consider the facts most favorable to NICTD as the non-moving party. *See id.* Thus, we must determine whether the trial court properly denied the remainder of Sequa's motion for summary judgment.

### A. Concealment

■ Sequa argues on appeal that the parties' agreement is void and unenforceable because NICTD concealed facts during the contract negotiation process. Sequa, however, did not allege concealment in its motion for summary judgment. Instead, Sequa argued "it was wholly unaware of the possibility that a Michigan train could become trapped in the holding area between the Conrail and the NICTD tracks ...." Appellant's App. pp. 187–88. Simply, Sequa argued that it did not have knowledge of a material fact that rendered the parties' agreement unconscionable.

Sequa relies on *Beaver v. Grand Prix Karting Assoc.,* 246 F.3d 905, 911 (7th Cir.2001), in support of its argument that NICTD's concealment of the danger renders the agreement void. The *Beaver* court concluded, however, there was no evidence that any safety hazards were concealed. As in *Beaver,* we find no evidence that NICTD made representations or attempted to conceal any known dangers associated with the railroad tracks. Sequa argues at length that it did not know of the

potential danger but does not assert any facts to support its claim that NICTD actually concealed the danger. Furthermore, Sequa's alleged lack of knowledge is not supported by the designated evidence. In a letter from NICTD to Sequa's Risk Manager dated August 15, 1995, regarding crossing insurance, NICTD informed Sequa that:

> As was apparent from our conversation, you were unaware that Sequa's route to and from the plant site exposes its grade crossing users to thirty-eight (38) high speed passenger trains on week days and thirty (30) passenger trains on weekend days. There are also a significant number or freight trains using the crossings—some of which are traveling at high speeds. While we have been fortunate to date at these locations, you should keep in mind that one act of negligence indemnified by Sequa could have Sequa responding to claims of several hundred passengers. Amtrak has recently suffered some serious and expensive losses arising out of the activities of third parties along the right of way. I therefore believe that the additional coverage must be in place to cover the risks arising out of Sequa's use of [NICTD's] crossings.

Appellant's App. pp. 345–46. This letter taken with the language of the indemnity clause, "[i]t is understood by all parties that [NICTD's] operations at or near the Crossings and other property associated with this Agreement involve some risk," sufficiently informs Sequa of the potential danger associated with the busy railroad tracks. Appellant's App. p. 118. We find no merit to Sequa's argument.

### B. Negotiations

■ Sequa next asserts that the unequal bargaining power between the parties and NICTD's refusal to negotiate the

indemnity clause rendered the agreement unenforceable. Sequa, however, has presented insufficient evidence to create a genuine issue of material fact with regard to either assertion.

In support of these claims, Sequa relied on its Vice President's affidavit in which he stated:

6. That [Sequa] was under tremendous compulsion to sign the Crossing Agreement in that if Sequa did not have the right to traverse NICTD's right-of-way Sequa would have virtually no access to its facilities located on the north side of the tracks, which would have substantially impaired [Sequa's] ability to utilize its facility.

Appellant's App. p. 264. Sequa also relied on the affidavit of its attorney, who stated:

4. That on numerous occasions, Sequa sought to mitigate the harshness of the indemnification provision and attempted to negotiate a modification of its terms.

5. That NICTD was entirely unwilling and adamantly refused to negotiate the terms of the indemnification provision and indicated to Sequa that Sequa could not utilize the Crossing without agreeing to the terms of the indemnification provision as drafted by NICTD.

6. That Sequa was under tremendous compulsion to sign the Crossing Agreement and to accept the take it or leave it terms as presented by NICTD.

7. That at all times relevant to the negotiations of the Crossing Agreement, [Sequa] was in such a position that it was forced to accept the terms of the Crossing Agreement as drafted by NICTD in order to have access to its facilities located north of the grade Crossing at Midwest Steel Road.

Appellant's App. p. 267.

 Indiana Trial Rule 56(E) requires that supporting and opposing affidavits be made on personal knowledge and set forth such facts as would be admissible in evidence. A statement in an affidavit in support of a motion for summary judgment that is no more than an opinion or a conclusion of law is not sufficient to establish the facts necessary to show that no genuine factual issue exists that would preclude summary judgment. *McMahan v. Snap on Tool Corp.*, 478 N.E.2d 116, 122 (Ind. Ct.App.1985). Many of the statements in these affidavits are no more than opinions or conclusions that would not be admissible and are insufficient to establish that no genuine issues of material fact exist.

 With regard to any remaining statements that might be sufficient, Sequa has not shown that it is entitled to judgment as a matter of law. "A contract will be deemed unconscionable when a great disparity in bargaining power exists which leads the weaker party to sign a contract unwillingly or without being aware of its terms." *Progressive Constr. & Eng'g Co., v. Indiana & Michigan Elec. Co.*, 533 N.E.2d 1279, 1286 (Ind.Ct.App.1989). "The contract must be 'such that no sensible man not under delusion, duress, or in distress would make, and such as no honest fair man would accept.'" *Id.* (citation omitted).

There is no indication that the parties' agreement rises to this level. Indemnity clauses are often entered into and there is nothing inherently unconscionable about a contract containing an indemnity clause or offering certain terms on a take it or leave it basis. Further, the evidence indicates that Sequa entered into negotiations with NICTD for several months before its purchase of the facility was complete. As such, Sequa could have chosen not to purchase the facility upon learning the terms of the agreement and NICTD's insistence that the indemnity clause was non-negotiable. The evidence also indicates that an

existing agreement concerning access to the facility existed with the previous owner and was transferable to Sequa, but Sequa chose to enter into a new agreement for its insurance own purposes. Thus, even if NICTD was in a position of superior bargaining power, we cannot conclude that there was such a great disparity so as to render the entire agreement unconscionable and therefore unenforceable.

### C. First Party Claims

■ Sequa next argues that the indemnity clause does not cover first-party claims. In other words, Sequa contends that, even if the contract is enforceable, Sequa is not required to reimburse NICTD for losses to NICTD's own personal property. Sequa relies on *Morris v. McDonald's Corp.*, 650 N.E.2d 1219, 1222 (Ind.Ct.App.1995), in which we compared exculpatory clauses to indemnity clauses. In this context, *Morris* defined an indemnity clause as covering "the risk of harm sustained by third persons that might be caused by either the indemnitor or the indemnitee. It shifts the financial burden for the ultimate payment of damages from the indemnitee to the indemnitor." *Id.*

The plain language of the parties' agreement, however, not only shifted the risk of harm to third parties to Sequa, but also shifted NICTD's loss arising out of an accident at Midwest Crossing to Sequa. For example, the agreement provides:

> The phrase "Loss or Damage" as used within this Agreement shall be interpreted by the parties to include any and all loss of, damage to, or destruction of any real property, personal property, or environment, including without limitation, damage to or destruction of land, air, water, wildlife, or vegetation, and *irrespective of whether the damaged or*

> *destroyed property is owned or otherwise possessed by [NICTD], Sequa, or a third party ....*

\* \* \* \* \*

> The phrase "Claims, Settlements, Litigation, and Related Expenses" *shall include any and all losses, damages, costs, payments, and expenses of every kind and nature, including reasonable attorney fees and disbursements, incurred by or attributable to [NICTD] ....*

\* \* \* \* \*

> Sequa shall hold harmless, defend, and indemnify [NICTD] ... from any and all Causes of Action, as defined above, asserted by any parties and non-parties to this Agreement ....

Appellant's App. pp. 119–20 (emphasis added). Based on this language, Sequa's arguments that the agreement only covered loss to third parties or is otherwise ambiguous fall short.

### D. Settlement Agreement

■ Sequa finally argues that it is not responsible for NICTD's settlement agreement with one of the decedents' estates because it was a voluntary loan payment and has not been determined to be reasonable.[5] It is clear, however, that an indemnitee's decision not to proceed to judgment provides no basis for an indemnitor's assertion that a settlement is a voluntary payment. *Progressive*, 533 N.E.2d at 1287. Accordingly, NICTD's decision not to proceed to judgment provides no basis for Sequa's assertion that NICTD's payment to a decedent's estate was voluntarily made. *See id.*

---

5. On appeal, Sequa argues that the settlement agreement is not final, but because Sequa did not raise this issue in its motion for summary judgment, we will not address it for the first time on appeal. *See Bass*, 779 N.E.2d at 590.

Sequa also contends that NICTD improperly entered into the settlement agreement without first consulting Sequa so that it could determine whether the settlement payment was reasonable. "An indemnitor who denies liability on an indemnity contract confers on the indemnitee the right to exercise reasonable judgment in settling the case without further consultation with the indemnitor." *Sink & Edwards, Inc. v. Huber, Hunt & Nichols, Inc.*, 458 N.E.2d 291, 297 (Ind.Ct.App. 1984). Although an indemnitee's decision not to proceed to judgment provides no basis for the indemnitor's assertion that a settlement constituted a voluntary payment, a question as to whether the settlement was fair and reasonable remains. *Id.*

In its response to Sequa's motion for summary judgment, NICTD argued that Sequa was estopped from asserting that it was not given the opportunity to determine whether the settlement agreement was reasonable because it never responded to NICTD's letters informing it of NICTD's intent to enforce the indemnity clause. *See* Appellant's App. pp. 358, 362. The trial court agreed, and so do we. Sequa acquiesced to the settlement agreement by ignoring NICTD's repeated requests for indemnification and assistance in defending against the litigation. *See Miller v. Geels*, 643 N.E.2d 922, 930 (Ind. Ct.App.1994) ("A person with full knowledge of the facts and aware of his rights who nevertheless stands by and acquiesces in conduct inconsistent with those rights may be estopped from subsequently asserting those rights."). Sequa may not ignore its obligation to indemnify NICTD and now assert that the reasonableness of the settlement agreement must still be determined. We note that the facts of this case mandate this conclusion, not all disputes regarding indemnity clauses mirror these particular circumstances.

## Conclusion

The indemnity clause of the parties' agreement is valid and enforceable because Sequa was acting more like an insurer than a user of NICTD's common carrier services. Further, Sequa has not established that NICTD concealed the danger associated with the railroad tracks and Michigan trains; that NICTD had superior bargain power sufficient to render the contract unenforceable; that the indemnity clause does not cover first-party claims; and that the settlement agreement NICTD entered into with a decedent's estate was voluntary or unreasonable. We affirm.

Affirmed.

DARDEN, J., and MAY, J., concur.