Michael STARESNICK, Appellant–
Respondent,

v.

Julie STARESNICK, Appellee–
Petitioner.

No. 49A02–0412–CV–1079.

Court of Appeals of Indiana.

July 12, 2005.

Preston T. Breunig, Martha L. Westbrook, Buck, Berry, Landau, & Breunig, P.A., Indianapolis, for Appellant.

Janice R. Mandla, Carmel, for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Michael Staresnick (Father), appeals the trial court's judgment in favor of Julie Staresnick (Mother), requiring Father to pay half of the college expenses of their son, Brian Staresnick (Brian).

We affirm in part, reverse in part, and remand with instructions.

### ISSUES

Father raises five issues on appeal, which we restate as the following:

1. Whether the trial court clearly erred in concluding that Brian has not repudiated Father, and thus that Father has a continuing duty to pay Brian's college expenses;

2. Whether the trial court clearly erred in denying Father's petition for modification of educational support;

3. Whether the trial court's judgment modifying Father's income withholding order to $149 per week is clearly erroneous;

4. Whether the trial court's judgment requiring Father to pay an outstanding balance of $3077.47 toward Brian's past college expenses is clearly erroneous; and

5. Whether the trial court abused its discretion in holding Father in contempt.

### FACTS AND PROCEDURAL HISTORY

Father and Mother were divorced pursuant to a Final Decree of Dissolution dated April 17, 2000. On August 15, 2002, the trial court issued its Order on Modification (the August 15 Order), in which Father and Mother were each ordered to pay one-half of Brian's college expenses, including tuition, housing, fees, books, and school supplies. In the August 15 Order, Mother was also ordered to provide Father with copies of Brian's semester grades within ten days of receiving them and all college bills upon receipt.

During the 2002–03 school year, Brian attended Indiana University—Bloomington as a freshman. Brian then transferred to Ball State University for his sophomore year and attended classes during both semesters of the 2003–04 school year as well as attending summer school. He antici-

pates that it will take him three more years to obtain his B.A.

On May 8, 2004, Father filed his Verified Petition for Contempt Citation, and Motion to Terminate Educational Expenses Order and to Emancipate Minor Child, or Alternatively, for Modification. In the first count of his Petition, Father sought a contempt citation against Mother, contending that she has failed to provide him with copies of Brian's grades or college bills as required by the August 15 Order. In the second count of his Petition, Father requested termination of his obligation to pay Brian's college expenses as ordered by the August 15 Order and emancipation of Brian "for all purposes" on the ground that Brian had repudiated Father. (Appellant's Appendix p. 43). Finally, in the event the second count was not granted, Father requested in the third count of his Petition that the trial court modify his child support and college education obligation. On June 25, 2004, Mother filed her Verified Petition to Modify and For Rule to Show Cause.

On August 12, 2004, the trial court conducted a hearing on both petitions. On October 5, 2004, the trial court issued Findings of Fact and Conclusions of Law, concluding that Brian has not repudiated Father, determining that both Mother and Father were in contempt, and ordering Father to pay the unpaid portion of his fifty percent of Brian's college expenses (the October 5 Order). The trial court's Findings of Fact and Conclusions of Law from the October 5 Order read in pertinent part as follows:

## FINDINGS OF FACT

. . .

6. The evidence establishes that Brian and Father have had little contact since the divorce. Specifically, Brian has spent very little, if any, evenings, week-ends, holidays, vacation, or other one-on-one time with Father since the divorce.

. . .

8. It is obvious that Brian and [Father] do not have a good relationship with each other and the [c]ourt finds that their relationship is complicated[,] involving the poor relationships and poor communications between the parties as well as Brian's perception, rightly or wrongly, that [Father] is responsible for causing the deterioration of the marriage.

9. The [c]ourt finds that, at no time, did Brian completely refuse to have a relationship with Father. Brian had attempted several times to initiate contact between himself and Father and had requested meetings and to spend time together with Father. Brian's only request of Father was that Father's girlfriend not be included in the meetings between [F]ather and son. . . .

10. Brian testified at the hearing that he wished to attempt to repair the parent-child relationship, that Brian did not believe the relationship between himself and [Father] was irretrievably broken, and that he was willing to attend counseling or have other meetings with Father. . . .

. . .

12. Brian did not consult [Father] prior to making the decision to transfer to Ball State. There is some dispute as to whether Father had Brian's address or telephone number while Brian was at I[ndiana] U[niversity]. There is no dispute that Father did not have Brian's address during the past year while Brian was at Ball State; Brian stated that this is because he did not want Father to just "show up."

13. Brian admits to having only two (2) telephone conversations with Father in

the last two years, and at least one of those calls involved asking Father for money. Brian also admits that he has told Father on different occasions that he did not want to see him anymore, that he did not respect him, that he did not like him very much, and that he was arrogant.

14. Brian testified that he did not intend to repudiate the relationship with Father, and that he wanted Father to support him financially. He considered asking Father to Dad's Day at Ball State last year, but decided against it feeling it would be too awkward. It is clear that Brian blames Father and Father's companion, Louise, for his parents' divorce. Brian testified that he did not want to go to lunch or dinner with father because he was afraid he would bring Louise.

15. In 2003, Father made an offer to Brian that they go to counseling to work on their relationship. Brian did not answer Father's offer. In [c]ourt, Brian testified that he did not want to go to counseling because he didn't see it as effective, it was unnatural, he did not enjoy it, and felt it was a burden. Neither Father nor Brian offered any alternatives for working on a relationship between them

. . .

30. Ball State estimates the total cost for a student to attend the 2004–2005 school year to be Fifteen Thousand Five Hundred Dollars ($15,500.00) for the average student. This includes fees, room, board, books, and miscellaneous expenses. Brian will be living in a fraternity and incurring less for housing expenses than included in the Ball State estimate, but board may be higher than Ball State estimates due to the fact the fraternity does not serve meals on weekends. Brian is expected to receive One Thousand Two Hundred Fifty Dollars ($1,250.00) in grants and Three Thousand Five Hundred Dollars ($3,500.00) in student loans.

. . .

32. Less grants and loans, Father's obligation remains at Five Thousand Five Hundred Eighty Seven 50/100 ($5,587.50).

. . .

34. Mother corresponded with Father on several occasions, providing Father with documentation showing the expenses which were being incurred either by Brian or on Brian's behalf and requesting that Father pay additional amounts toward the post-secondary educational expenses. Father refused to pay any additional amounts towards Brian's expenses than what was being withheld from his income. Mother testified that she was forced to obtain multiple loans to pay her share of the expenses, as well as Father's unpaid portion of the post-secondary expenses, thereby incurring additional debt and interest expenses due to Father's failure to pay his court-ordered fifty percent (50%) share of the expenses.

*CONCLUSIONS OF LAW*

. . .

1. Brian has not repudiated his Father.

2. The issue has been raised that there is an ambiguity between paragraphs 7 and 12 of the [c]ourt's August 15, 2002 Order on Modification. The phrase "[t]he court sees no reason to deviate from the original decree that requires the parties to each pay one-half of the college expense" controls. Applying this rule, the [c]ourt finds that the income withholding order does not satisfy all of Father's obligations for college edu-

cation expenses for the 2002–2004[sic] school year.

. . .

7. Historically, there has been a problem with Mother claiming reimbursement for bills which are not within the scope of the [c]ourt [o]rder. It was the intention of this [c]ourt that its August 15, 2002 Order of Modification be interpreted so that Father pay a fixed amount between the parties as to Father's obligation or whether expenses were within the scope of this [c]ourt's [o]rder, and no further requirement for this [c]ourt to make a determination as to what extraneous expenses submitted by Mother were within the scope of the [c]ourt [o]rder.

(Appellant's App. pp. 23–35). On November 4, 2004, Father filed his Verified Petition to Credit Overpayment of Child Support Toward College Education Expenses and a Motion to Correct Errors. On November 8, 2004, the trial court issued an Order denying both the petition and the motion.

Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. Standard of Review

When the trial court has entered findings of fact and conclusions of law pursuant to Indiana Trial Rule 52, we apply the following two-tiered standard of review: whether the evidence supports the findings and whether the findings support the judgment. *Clark v. Crowe,* 778 N.E.2d 835, 839 (Ind.Ct.App.2002). The trial court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. *Id.* at 839–40. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.* at 840. We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. *Id.* We review conclusions of law *de novo. Bass v. Bass,* 779 N.E.2d 582, 588 (Ind.Ct.App. 2002), *trans. denied.*

### II. Repudiation of Father

■ First, Father contends that the trial court erred in concluding that Brian has not repudiated Father and that Father, therefore, has a continuing duty to pay Brian's college expenses.[1] Specifically, Father argues that the evidence does not support the trial court's findings of fact and the findings do not support the judgment; thus, Father urges us to set aside the findings and judgment as clearly erroneous. We are not persuaded.

1. At the outset, we note that Father captioned his motion in this case as Verified Petition for Contempt Citation, and Motion to Terminate Educational Expenses Order and to Emancipate Minor Child, or Alternatively, for Modification. In that motion, Father "petition[ed] th[e] [trial] [c]ourt for termination of the current educational expenses order and for an order emancipating the minor child for all purposes." (Appellant's App. 43). As Mother points out, however, emancipation proceedings are governed by Indiana Code section 31–16–6–6, which permits the continuation of educational support beyond the date of a child's emancipation. *See* Ind.Code § 31–16– 6–6(a)(1). Moreover, Father did not and does not now argue any of the statutory grounds for emancipation. *See* I.C. § 31–16–6–6. Rather, he contends that his educational support obligation should terminate on the ground that Brian has repudiated him. Although Father captioned his motion as one to emancipate, we are not bound to so limit our review if the motion's intent is clearly otherwise. *See Cure v. Cure,* 767 N.E.2d 997, 1003 (Ind.Ct.App.2002). Thus, we will nonetheless consider whether Father was entitled to the relief he sought even though he proceeded incorrectly. *See id.*

■ Indiana law recognizes that a child's repudiation of a parent—that is, a complete refusal to participate in a relationship with his or her parent—under certain circumstances will obviate a parent's obligation to pay certain expenses, including college expenses. *Bales v. Bales*, 801 N.E.2d 196, 199 (Ind.Ct.App.2004), *reh'g denied, trans. denied*. In *McKay v. McKay*, 644 N.E.2d 164, 168 (Ind.Ct.App. 1994) (citing *Milne v. Milne*, 383 Pa.Super. 177, 556 A.2d 854, 856 (1989)), this Court adopted the rationale of a Pennsylvania decision which held that where a child, as an adult over eighteen years of age, repudiates a parent, that parent must be allowed to dictate what effect this will have on his or her contribution to college expenses for that child. The *McKay* court, in light of *Milne*, held that a twenty-year-old son had repudiated his father such that his father was relieved of the responsibility to pay his son's college expenses where the son consulted with his mother and stepfather on all of his college-related decisions, rejected all of his father's efforts to reconcile their relationship, and testified that he had no interest in reestablishing a relationship with his father and nothing could be done to change his mind. *McKay*, 644 N.E.2d at 166.

Here, Father argues specifically that Finding 10 is not supported by the evidence, that Findings 10 and 15 are in conflict, and that Findings 6, 8, 12, 13, 14, and 15 do not support the trial court's conclusion that Brian has not repudiated his Father. With regard to the issue of attending counseling, the subject of Findings 10 and 15, the record reveals that Brian testified as follows during cross-examination:

> [Father's counsel]: Did [Father] ask you last year—I'm talking about 2003—to go to counseling with him?

> [Brian]: He might have but I didn't see counseling as effective. That was just another unnatural way of interacting with my dad. I mean, even when I went to counseling with him that wasn't something that I enjoyed doing, that was something that I was forced to [do] because the [c]ourt said I had to. And we never—I don't think we got anything accomplished during counseling.

> [Father's counsel]: My question is this: In 2003—and you can answer this yes or no—didn't he ask you to go to counseling with him to reestablish a relationship?

> [Brian]: He asked me to go to counseling with him, yes.

> [Father's counsel]: Did you do that?

> [Brian]: No.

> . . .

> [Father's counsel]: It's clear that you don't want to see him at this point in your life, isn't it?

> [Brian]: It's not true. . . . I'd like to rebuild a relationship with my dad, but it's too awkward to just, you know, start having lunches again. I haven't even had a phone call from my dad, and I think that's step one before going to lunch and meeting with each other and going to counseling.

(Transcript pp. 70–71). Later, during his redirect examination, Brian testified that "[i]t would be nice to know that . . . my dad could be there for future things like that, . . . [to] teach me about, you know growing up and . . . being a gentleman, and just normal things that most sons have with their father." (Tr. p. 83).

According to the record, Finding 10 reads as follows:

> 10. Brian testified at the hearing that he wished to attempt to repair the parent-child relationship, that Brian did not believe the relationship between himself

and [Father] was irretrievably broken, and *that he was willing to attend counseling* or have other meetings with Father. Father testified that he was willing to spend time with Brian one-on-one without Father's girlfriend being present.

(Appellant's App. pp. 25–26) (emphasis added). Finding 15, which Father argues conflicts with Finding 10, reads as follows:

15. In 2003, Father made an offer to Brian that they go to counseling to work on their relationship. Brian did not answer Father's offer. In [c]ourt, Brian testified that he did not want to go to counseling because he didn't see it as effective, it was unnatural, he did not enjoy it, and felt it was a burden. Neither Father nor Brian offered any alternatives for working on a relationship between them.

(Appellant's App. p. 27).

Thus, Finding 10 states, among other things, that Brian is willing to attend counseling with Father, while Finding 15 states that, for a variety of reasons, Brian did not want to (and did not) attend counseling when Father asked him to do so in 2003. It does not appear from his testimony, however, that he is categorically opposed to attending counseling at some point in the future. Rather, Brian testified that he would like to begin rebuilding their relationship in a more gradual, natural way, such as through phone calls with Father, which Brian stated would be "step one before ... going to counseling." (Tr. p. 71). In sum, we cannot say that Finding 10 is clearly erroneous or that Findings 10 and 15 are necessarily in conflict.

Next, Father argues that Findings 6, 8, 12, 13, 14, and 15 do not support the trial court's conclusion of law that Brian has not repudiated his relationship with Father. As seen by the record, however, several of the trial court's other Findings, which are supported by evidence, do support that conclusion. In Finding 9, for instance, the trial court found that "at no time[ ] did Brian completely refuse to have a relationship with ... Father." (Appellant's App. p. 25). In Finding 10, as discussed above, the trial court found that "Brian testified at the hearing that he wished to attempt to repair the parent-child relationship ...." (Appellant's App. p. 25).

In *Loden v. Loden,* 740 N.E.2d 865, 869 (Ind.Ct.App.2000), this court considered a father's contention that the trial court had erred in awarding post-secondary educational support to his daughter because his daughter had repudiated the parent-child relationship with him. There, we found that the father had failed to prove his daughter had repudiated him since evidence was presented showing that the daughter "sought to reestablish a relationship with [her father] by sending him an invitation to her high school graduation," which the father had failed to acknowledge or respond to. *Id.* at 870. In *Cure v. Cure,* 767 N.E.2d 997, 1002 (Ind.Ct.App. 2002), we determined that a college-age daughter had not repudiated her relationship with her father because she "testified that she desired to have a relationship with her father and that, in her opinion, their relationship could be reconciled."

Here, the record reveals that Brian feels deep animosity toward Father's companion, Louise; Brian testified he is unwilling to spend the night at the house Father shares with Louise and that he is wary of going to lunch with Father because he is afraid Father will bring Louise. Brian also refused to attend counseling with Father in 2003, testifying that he felt it was ineffective and an "unnatural way of interacting with [Father]." (Tr. p. 70). Nonetheless, Brian clearly testified that he would like to rebuild his relationship with Father, albeit in a gradual, "natural" way,

such as through phone calls. (Tr. p. 82). Brian also testified: "I would like for my dad to support me since he's my father . . . and not just financially." (Tr. p. 72). As a specific example, Brian testified that he would have liked for Father "to be excited about [Brian] getting into architecture." (Tr. pp. 82–3).

Without assessing the credibility of witnesses, and considering the evidence most favorable to the judgment in light of Indiana caselaw, we hold that it was not unreasonable for the trial court to conclude that Brian has not repudiated Father. *See Clark,* 778 N.E.2d at 840. It thus follows that Father is not absolved of his responsibility to pay toward Brian's college expenses.

### III. *Income Disparity*

■ Next, Father appears to argue that, in light of the income disparity between the parties, the trial court erred in denying his petition to modify his educational support obligation. Actually, Father asserts in his appellant's brief that the trial court "failed to consider" his argument that his support obligation should be modified in light of the disparity between the parties' incomes, as evidenced by the fact that "[t]he trial court's findings did not address the Father's request for modification (if termination of the obligation was not granted) in any way." (Appellant's Br. pp. 21–22). The record reveals, however, that as a conclusion of law, the trial court denied Father's petition in its entirety. Thus, we will consider whether the trial court erred in denying Father's petition to modify his support obligation.

■ We agree that provisions for the payment of college expenses are modifiable, as college expenses are in the nature

of child support. *Hay v. Hay,* 730 N.E.2d 787, 791–92 (Ind.Ct.App.2000). On appeal from the denial of a petition to modify, we review the trial court's decision under the clearly erroneous standard. *Id.* at 792. We will reverse a decision regarding modification of support only where it is clearly against the logic and effect of the facts and circumstances that were before the trial court. *Id.*

According to Indiana Code section 31–16–8–1, provisions of an order with respect to child support may be modified or revoked:

(1) upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable; or

(2) upon a showing that:

(A) a party has been ordered to pay an amount in child support that differs by more than twenty percent (20%) from the amount that would be ordered by applying the child support guidelines; and

(B) the order requested to be modified or revoked was issued at least twelve (12) months before the petition requesting modification was filed.

Yet Father does not assert either of these statutory grounds in support of his contention that the trial court erred in denying his petition for modification.[2] Instead, he argues that "uncontroverted evidence established" a disparity between the parties' incomes as Mother earns $1,220.96 per week and Father, after payment of Brian's health insurance premiums, earns $952.91 per week. (Appellant's Br. p. 22). Further, Father complains that Mother "receives the child support dependency exemption for Brian, and because of Brian, is able to use head of household federal tax

---

**2.** If Father's argument is that the income disparity is a "changed circumstance," he has failed to demonstrate that the disparity is any different than at the time of the August 15 Order.

rates which are lower than single rates." (Appellant's Br. p. 22). Father, however, cites no authority in support of his contention that these facts alone warrant modification of his support obligation. In short, Father has failed to persuade us that the trial court's decision was clearly against the logic and effect of the facts and circumstances that were before the trial court; thus, we find that the trial court's denial of his petition to modify was not clearly erroneous.

## IV. *Miscalculation of Amount Owed Weekly*

 Next, Father asserts that the trial court miscalculated Father's weekly support obligation. Specifically, Father asserts that the trial court's judgment modifying his Income Withholding Order to $149 per week is clearly erroneous because, according to the trial court's Findings, he should owe only $107 per week. Father points to Findings 30 and 32 in support of this contention.

In Finding 30, the trial court found as follows:

Ball State estimates the total cost for a student to attend the 2004–2005 school year to be Fifteen Thousand Five Hundred Dollars ($15,500.00) for the average student. This includes fees, room, board, books, and miscellaneous expenses. Brian will be living in a fraternity and incurring less for housing expenses than included in the Ball State estimate, but board may be higher than Ball State estimates due to the fact the fraternity does not serve meals on weekends. Brian is expected to receive One Thousand Two Hundred Fifty Dollars ($1,250.00) in grants and Three Thou-

sand Five Hundred Dollars ($3,500.00) in student loans.

(Appellant's App. p. 32). Finding 32 reads as follows: "Less grants and loans, Father's obligation remains at Five Thousand Five Hundred Eighty Seven 50/100 ($5587.50)." (Appellant's App. p. 32). Father now contends that, according to the numbers set forth in Finding 30, he should owe a total of $5,375 rather than $5,587; thus, he asserts that his weekly obligation should be $107 rather than $149.[3]

Mother maintains that the evidence and reasonable inferences therefrom support the trial court's order. Initially, Mother acknowledges that a calculation of the figures from Finding 30, which she calls "the Ball State estimate," results in a shared obligation of $10,750. (Appellee's Br. p. 14). When half of that amount, $5,375, is divided by fifty-two weeks, the amount owed per week appears to be approximately $103. Mother then justifies the amount in excess of $103 as follows. First, Father was ordered to pay child support for Brian in the amount of $41 per week until Brian's 21st birthday, which the trial court found was on October 21, 2004—less than a month after the order was issued. The additional $41 per week plus the $103 totals $144. Second, Mother points out that the trial court found that Brian would incur expenses above the Ball State estimate, most notably for food on the weekends. Although Mother testified that this cost was approximately $35 per week, the trial court found that some of the additional expenses listed on Mother's summary exhibits were excessive. Thus, Mother claims that the reasonable inference to be drawn from the trial court's findings is that the unaccounted-for five dollars was added to the $144 in order to be applied to

3. We are at a loss as to why Father asserts that $5,375 divided by fifty-two equals $107, rather than $103.

Brian's weekend food expense. Post-emancipation, the additional $41 that Father was paying for child support would also be applied to Brian's "costs for food." (Appellee's Br. p. 15). We are unpersuaded by Mother's attempts to explain the mysterious figure of $149, which strike us as an exercise in post hoc rationalization.

As stated before, a judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *See Clark*, 778 N.E.2d at 840. Here, we are convinced that the trial court made a mistake, either in calculation or explanation, and that the amount of $149 per week is clearly erroneous. Therefore, we remand for clarification, with instructions to the trial court either to justify Father's $149 weekly payment or to correct the amount of Father's weekly obligation in a manner consistent with its findings.

### V. *Miscalculation of Expenses Currently Owed*

■ Father also asserts that the trial court erred in ordering him to pay an outstanding balance of $3,077.47 toward Brian's 2002–2004 college expenses. Specifically, Father contends that the trial court failed to credit all the payments he made to the Clerk's office by way of an ongoing income withholding order. Further, Father argues that he should not be required to pay for a computer Brian acquired during his freshman year because no receipts for the computer were presented to Father and because the trial court had already calculated Father's obligations for Brian's freshman year in the August 15 Order and had not included the computer in that calculation.

Father, then, is asking us to review the amount and frequency of payments he made to the Clerk's office and to second-guess the trial court's implied determination that Brian's computer was properly included as a college expense. Unlike in the weekly payment issue, here the trial court's judgment is clearly supported by its findings, which are in turn supported by evidence. Essentially, Father is urging us to reweigh the evidence presented to the trial court, including evidence unfavorable to the judgment, and to make our own findings thereon. This we will not do. *See Clark*, 778 N.E.2d at 840.

### VI. *Judgment of Contempt*

■ Last, we consider Father's contention that the trial court erred in holding Father in contempt of the August 15 Order for failing to pay Brian's college expenses because, he argues, the August 15 Order was inconsistent and because Mother failed to provide Brian's college bills to him in a timely manner. A trial court has the discretion to determine whether a party is in contempt of court. *Dawson v. Dawson*, 800 N.E.2d 1000, 1005 (Ind.Ct. App.2003). Therefore, our review is limited to considering the evidence and the reasonable inferences drawn therefrom that support the trial court's determination. *Id.* We neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* A trial court's decision will only be reversed for an abuse of discretion. *Id.* A trial court abuses its discretion when its decision is against the logic and effect of the facts and circumstances before the court or is contrary to law. *Id.* When a person fails to abide by the trial court's order, he bears the burden of showing that the violation was not willful. *Id.*

Here, the trial court found Father in contempt of the August 15 Order for failing to pay his fifty percent share of Brian's college expenses. Specifically, in its Finding 34 of the October 5 Order, the trial court found as follows:

Mother corresponded with Father on several occasions, providing Father with documentation showing the expenses

which were being incurred either by Brian or on Brian's behalf and requesting that Father pay additional amounts toward the post-secondary educational expenses. Father refused to pay any additional amounts towards Brian's expenses than what was being withheld from his income. Mother testified that she was forced to obtain multiple loans to pay her share of the expenses, as well as Father's unpaid portion of the post-secondary expenses, thereby incurring additional debt and interest expenses due to Father's failure to pay his court-ordered fifty percent (50%) share of the expenses.

(Appellant's App. pp. 32–33).

As Father points out, however, there was some ambiguity with regard to what constituted compliance with the trial court's August 15 Order. In that Order, the trial court had ordered Father in paragraph 12 to execute an income withholding order based on "an annualized calculation for the figures of child support, tuition, fees, housing, books and supplies as ordered herein." (Appellant's App. p. 40). Father executed the income withholding order in compliance with the August 15 Order. But in paragraph 7 of the August 15 Order, the trial court also wrote: "The court sees no reason to deviate from the original decree that requires the parties to each pay one-half of the college expense . . . ." (Appellant's App. p. 40).

Then, in Conclusion 2 of the October 5 Order, the trial court clarified what it had intended in the August 15 Order, writing as follows:

The issue has been raised that there is an ambiguity between paragraphs 7 and 12 of the [c]ourt's August 15, 2002 Order on Modification. The phrase "[t]he court sees no reason to deviate from the original decree that requires the parties to each pay one-half of the college ex-

pense" controls. Applying this rule, the [c]ourt finds that the income withholding order does not satisfy all of Father's obligations for college education expenses for the 2002–2004 school year.

(Appellant's App. p. 34). But in Conclusion 7 of its October 5 Order, the trial court also wrote:

Historically, there has been a problem with Mother claiming reimbursement for bills which are not within the scope of the [c]ourt [o]rder. It was the intention of this [c]ourt that its August 15, 2002 Order of Modification be interpreted so that Father pay a fixed amount between the parties as to Father's obligation or whether expenses were within the scope of this [c]ourt's [o]rder, and no further requirement for this [c]ourt to make a determination as to what extraneous expenses submitted by Mother were within the scope of the [c]ourt [o]rder.

(Appellant's App. p. 35).

We agree with Father that these conclusions are in apparent conflict and that there is some ambiguity as to what Father was required to do in order to comply with the August 15 Order. Particularly in light of Father's prompt compliance with the trial court's order that he execute an income withholding order, and the trial court's additional findings in its October 5 Order that the bills sent by Mother to Father were untimely and a number of the expenses listed on Mother's summary exhibits "are either not properly documented, are excessive, or do not fall within what would be considered usual and ordinary college educational expenses which a[c]ourt would award[,]" we are persuaded that Father's failure to comply with the August 15 Order was not willful. (Appellant's App. p. 31). Thus, we find that the trial court abused its discretion in finding Father in contempt of the August 15 Order. *See Dawson,* 800 N.E.2d at 1005.

This determination, however, has no effect on the amount of money Father owes Mother for Brian's past college expenses.

### CONCLUSION

Based on the foregoing, we conclude that Brian has not repudiated Father, and therefore that Father is not absolved of his responsibility to pay for Brian's college expenses; that the trial court's denial of Father's petition for modification was not clearly erroneous; that the judgment modifying Father's weekly payment amount to $149 is clearly erroneous but the judgment ordering Father to pay an outstanding balance of $3077.47 for Brian's college expenses is not; and, finally, that the trial court abused its discretion in finding Father in contempt of the August 15 Order. Thus, we affirm in part and reverse in part the trial court's October 5 Order and remand to the trial court with instructions either to justify or to correct Father's weekly payment obligation.

Affirmed in part, reversed in part, and remanded with instructions.

SULLIVAN, J., and NAJAM, J., concur.