877 N.E.2d 1239 (2007)
In re the Matter of the PATERNITY OF M.M.B. and A.W.T.,
State of Indiana, Appellant,
v.
McKinzie M. Black, Jr., Appellee.
No. 45A03-0706-JV-253.
Court of Appeals of Indiana.
December 14, 2007.
Steve Carter, Attorney General of Indiana, Frances H. Barrow, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

OPINION
NAJAM, Judge.

STATEMENT OF THE CASE
The State appeals the trial court's order vacating its prior judgment of the paternity of McKinzie M. Black, Jr., over M.M.B. and A.W.T., two minor children. We address a single dispositive issue on review, namely, whether the trial court clearly erred in vacating its prior judgments.
We reverse.

*1240 FACTS AND PROCEDURAL HISTORY
On May 9, 1990, Angela Tucker ("Mother") and Black jointly filed a petition to establish the paternity of M.M.B. ("M.M.B.-Paternity Petition"), who was born out of wedlock on June 16, 1989. When he signed the M.M.B.-Paternity Petition, Black also signed an accompanying form in which he waived "now and forever" his right to counsel and his right to request blood testing to establish paternity ("Waiver Form"). Appellant's App. at 22, 24. On July 10, 1990, the trial court accepted the M.M.B.-Paternity Petition and entered an order establishing Black as the father of M.M.B. The court also ordered Black to pay child support for M.M.B.
On November 5, 1990, Mother and Black jointly filed a petition to establish the paternity of A.W.T. ("A.W.T.-Paternity Petition"), who was born out of wedlock on August 17, 1990. As he had done with the M.M.B.-Paternity Petition, Black again signed an accompanying Waiver Form for the A.W.T.-Paternity Petition. On January 8, 1991, the court accepted the A.W.T.-Paternity Petition and entered an order establishing Black as the father of A.W.T. The court also ordered Black to pay child support for A.W.T.
In 1991, Black moved to Tennessee. While there, Black had three children with Melissa Black, whom he subsequently married. Between 1991 and 1996, M.M.B. and A.W.T. spent summers with Black in Tennessee, and Black returned to Indiana to visit them over Christmas. But in 1996, Black was incarcerated for involuntary manslaughter, "drug sales," and aggravated assault. Id. at 81. Black remained in prison until 2002.
In the winter of 2002, after Black was released from prison, he picked up M.M.B. and A.W.T. from their Indiana home and took them to his home in Tennessee. M.M.B. and A.W.T. lived with Black for the next thirteen months. However, at the end of that time period, Black's three children with Melissa overheard A.W.T. tell M.M.B. that M.M.B.'s biological "daddy was dead." Id. at 47. In response, M.M.B. said to A.W.T., "well you don't even look like dad." Id. Black's children with Melissa informed Black of what M.M.B. and A.W.T. had said, and Black subsequently sought DNA confirmation of his paternity of M.M.B. and A.W.T.
Those genetic tests disclosed a "0.00%" probability that Black was the father of either M.M.B. or A.W.T. Id. at 29, 32. Black contacted Mother about the tests, and Mother told Black that she knew Black was not the father of either M.M.B. or A.W.T. Mother then asked Black to send the children back to her. On the way back to Indiana, Black talked to M.M.B. and A.W.T. about the genetic test results. M.M.B. told Black that M.M.B. knew who his biological father was, and that the biological father "had been buying [M.M.B.] stuff . . . and had spent time with them." Id. at 50. Black subsequently lost contact with M.M.B. and A.W.T. because of Mother's transient status.
On January 31, 2005, Black filed a motion to vacate the M.M.B.-Paternity Petition, the A.W.T.-Paternity Petition, and the accompanying orders for him to pay child support for M.M.B. and A.W.T. The trial court held a hearing on February 9, 2007, at which Black testified that he was illiterate and mentally unstable when he signed the original paternity petitions and the Waiver Forms. Black also testified that he was living with Mother when she gave birth to M.M.B. and A.W.T., that Mother had testified at the original paternity proceedings both that Black was the father of M.M.B. and A.W.T., and that no one else could be their father.
*1241 On March 19, 2007, the court entered its Order Granting Motion to Vacate Orders ("Order"). In that Order, the court stated, in pertinent part, as follows:
[Black] was under a mental disability prior to both hearings establishing paternity for [M.M.B.] and [A.W.T.] Respondent [Black] had been hospitalized for mental problems prior to both hearings, and had continuing untreated mental problems after being released from treatment at Methodist Hospital in Gary, Indiana, prior to the paternity determination in both causes. The mental problems continued after the date of the hearing, and were untreated due to financial and other considerations. [Black] and [Mother] lived together before, during and briefly after paternity was established for [M.M.B.] and [A.W.T.]
Respondent's admission of paternity in both cases was made relying on mother's testimony that no one but he could be the father of [M.M.B.] and [A.W.T.] Respondent believed mother and saw no need to spend money for blood testing. Respondent Black could barely read at the fourth grade level when he appeared in court for hearing on the paternity matters that concern the court. He did not appreciate that legal consequence of signing the waiver of blood testing affidavit. Mr. Black was not mentally competent to waive of [sic] his right to blood test or counsel, nor was he competent to enter a knowing admission of paternity.
* * *
The strongest argument made by respondent was that it would be unfair to require him to be bound by the judgments entered considering that he was incompetent at the time the judgments were entered, his admissions were based upon the false statements mother made in court regarding whether any other man could be the father of his children, and that it would be unfair that he support children that are not his biological children to the economic detriment of his younger children.
T.R.[60](B)(7) & (8) recognize that our courts should always aspire to do equity. The burden is upon the respondent Black to prove affirmatively that relief is necessary and just. Respondent proved that he was not competent at the time of the adjudication of paternity in these cases. There is no question that Black was not able to read or understand the document he signed that suggested that he voluntarily waived his right to blood test and counsel. Respondent Black did not look for an opportunity to take DNA test[s] to avoid parental responsibility. The need was thrust upon him in an unexpected time by the words coming from the mouths of his own young boys. Even though the circumstances that lead [sic] respondent to obtain DNA test[s] was not that which our Supreme Court considered in Fairrow v. Fairrow, 559 N.E.2d 597 [Ind. 1990], the circumstances were nevertheless unique.
This case is unique and therefore similar to Fairrow in that the DNA testing occurred not as a defense or attempt to evade paying support but rather because of the information his younger sons provided. This case is unique because the subject [sic] of these cases, [A.W.T.] and [M.M.B.], were aware that respondent Black was not their father. This case is different because on two separate occasions the mother appeared in this court and intentionally lied about the paternity of her children. Mother certainly has dirty hands. Respondent has paid for his crimes and has married the mother of his two younger children. It is unfair that the paternity judgment *1242 requiring that he pay support have any further force and effect. In this unusual case, respondent [Black] affirmatively demonstrated that the relief he sought was necessary and just. The trial court should grant his petition based upon T.R. [60](B)(7) & (8).
Id. at 11-12, 15-16 (emphasis added). This appeal ensued.

DISCUSSION AND DECISION
We initially note that Black did not timely file an appellee's brief. Accordingly, we do not undertake the burden of developing arguments for the appellee, as that duty remains with him. Railing v. Hawkins, 746 N.E.2d 980, 982 (Ind.Ct. App.2001). Normally when the appellee does not file a brief, we apply a less stringent standard of review and may reverse the trial court when the appellant establishes prima facie error. Id. "Prima facie" is defined as "at first sight, on first appearance, or on the face of it." Id. (quoting Johnson County Rural Elec. Membership Corp. v. Burnell, 484 N.E.2d 989, 991 (Ind.Ct.App.1985)).
Here, the trial court granted Black's petition for relief under Indiana Trial Rule 60(B)(8). Rule 60(B)(8) states:
On motion and upon such terms as are just the court may relieve a party or his legal representative from an entry of default, final order, or final judgment . . . for . . . any reason justifying relief from the operation of the judgment, other than those reasons set forth in subparagraphs (1), (2), (3), and (4).
That is, Rule 60(B)(8) provides relief from judgment for any reason other than those set forth in Rules 60(B)(1) (mistake, surprise, or excusable neglect), 60(B)(2) (any grounds that could be raised on motion to correct error), 60(B)(3) (fraud), or 60(B)(4) (default without proper notice). Gipson v. Gipson, 644 N.E.2d 876, 877 (Ind.1994). Any claim filed under Rule 60(B)(8) must be filed within a reasonable period of time after the judgment is entered. Id. The burden is upon the movant to demonstrate affirmatively that relief is necessary and just. Id. (citing Fairrow, 559 N.E.2d at 599).
The decision of whether to grant or deny a Rule 60(B)(8) motion is left to the equitable discretion of the trial court and generally is reviewable only for abuse of that discretion. Id. However, where, as here, the trial court has entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52, we apply the following two-tiered standard of review: whether the evidence supports the findings and whether the findings support the judgment. Staresnick v. Staresnick, 830 N.E.2d 127, 131 (Ind.Ct.App.2005). The trial, court's findings and conclusions will be set aside only if they are clearly erroneous, that is, if the record contains no facts or inferences supporting them. Id. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. Id. We neither reweigh the evidence nor assess the credibility of witnesses, but consider only the evidence most favorable to the judgment. Id.; see Gipson, 644 N.E.2d at 877. We review conclusions of law de novo. Staresnick, 830 N.E.2d at 131.
Here, the trial court proffered three reasons in support of granting Black's request. First, the court stated that Black was not competent when he signed the paternity affidavits because he "was not able to read or understand the documents." Appellant's App. at 16. Second, the court found that Black's "admissions were based upon the false statements [M]other made in court." Id. at 15. And third, the court concluded "that it would be unfair that he support children that are *1243 not his biological children to the economic detriment of his younger children." Id.
The State responds that the trial court acted outside of its equitable discretion in granting Black relief under Trial Rule 60(B)(8). Specifically, the State contends[1] that the trial court abused its discretion in granting Black's request because "Black did not inadvertently obtain medical proof of non-paternity through ordinary medical care." Appellant's Brief at 11. We must agree.
In Fairrow, the purported father of a child from a prior marriage consulted a medical geneticist after the child developed sickle cell anemia and the mother obtained a medical test excluding her as a carrier of the sickle cell trait. Fairrow, 559 N.E.2d at 598. When the purported father's test for the sickle cell trait likewise came back negative, the geneticist informed him that he could not possibly be the child's father. Id. As a result, he filed a petition for termination of child support under Trial Rule 60(B)(8). Our Supreme Court held he was entitled to relief. Id.
In reaching its holding, our Supreme Court stated as follows:
In this very unusual case, Joe affirmatively demonstrated that the relief he sought was necessary and just. The trial court should have granted his petition.
* * *
Joe's petition was based on newly discovered medical evidence proving that he could not be Joseph's father, rather than on a belated suggestion that there might have been insufficient evidence to prove paternity when the trial court entered its paternity determination. Furthermore, Joe did not seek the genetic testing because he wanted to stop paying child support. He sought the testing at his doctor's suggestion, after being informed that Joseph was experiencing symptoms of sickle cell anemia.

* * *
In light of the unusual way in which he stumbled upon medical evidence demonstrating that he was not [the child's father], eleven years was not an unreasonable amount of time after which to file a T.R. 60(B)(8) motion. The Court of Appeals relied on the underlying public policy that financial support should not be terminated if it is "firmly established." We agree that both the legislature's design of our dissolution statute and the available sociological evidence suggest the importance of stability in legally established relationships between parents and children. On the other hand, there is a substantial public policy, namely justice, which disfavors a support order against a husband who is not the child's father.
A child born during marriage is presumed legitimate. This presumption is not conclusive although it may be rebutted only by direct, clear, and convincing evidence. R.D.S. v. S.L.S. (1980), Ind. *1244 App., 402 N.E.2d 30. If the direct, clear, and convincing evidence is present, Indiana cases show that entering a support order against a husband who is not the child's father is generally improper. See Id. at 33 (citing Pilgrim v. Pilgrim (1947), 118 Ind.App. 6, 75 N.E.2d 159).
In this case, there is direct, clear, and convincing evidence that Joe is not Joseph's biological father. If, at the time of the dissolution hearing, the trial court had been presented with the medical evidence now available, it would not have been in a position to enter the support order.
Although we grant Joe relief, we stress that the gene testing results which gave rise to the prima facie case for relief in this situation became available independently of court action. In granting relief to a party who learned of his non-parenthood through the course of ordinary medical care, we do not intend to create a new tactical nuclear weapon for divorce combatants. One who comes into court to challenge a support order on the basis of non-paternity without externally obtained clear medical proof should be rejected as outside the equitable discretion of the trial court.
In sum, we strongly discourage relitigation of support issues through T.R. 60(B)(8) motions in the absence of highly unusual evidence akin to the evidence presented in this case.

Id. at 599-600 (footnote omitted; emphases added).
Applying Fairrow, in Pinter v. Pinter, 641 N.E.2d 101, 104-05 (Ind.Ct.App.1994), we reversed a trial court's Rule 60(B)(8) relief to a man that had independently obtained a blood test demonstrating that he was not the child's father. As in Fairrow, the child was born during a prior marriage of the man seeking to disavow paternity. Indeed, we recognized that "[t]he present case fits the framework established in Fairrow to the extent that [the purported father] presented clear, direct, and convincing medical evidence of his nonpaternity through the blood test performed in Florida, which was obtained without court action." Id. at 105. Nonetheless, we reversed the trial court's decision because we could not say that the purported father "`stumbled upon' medical evidence demonstrating nonpaternity or that the paternity testing was brought about by `unusual' circumstances." Id.
Shortly thereafter, this court applied the holding in Pinter against a purported father that had signed a paternity affidavit establishing his paternity to a child born out of wedlock. In re K.M., 651 N.E.2d 271 (Ind.Ct.App.1995). Fifteen years after signing that affidavit, the child developed a rare bone disease, which raised the purported father's "suspicions . . . that he may not have been [the child's] biological father." Id. at 274. The man then obtained a blood test that excluded him as the child's biological father and, subsequently, he filed a Rule 60(B) motion to vacate the prior paternity adjudication. The trial court granted the man's request, but we reversed, holding that "one who comes into court to challenge an otherwise valid order establishing paternity, without medical proof inadvertently obtained through ordinary medical care, should be denied relief as outside the equitable discretion of the trial court." Id. at 276.
Shortly after this court handed down its opinion in In re K.M., our Supreme Court clarified the scope of Fairrow in a case where the purported father filed his Rule 60(B) petition only because "he had reason to believe" that a child was not his biological child. The court, in agreeing that the father failed to satisfy Fairrow's requirement *1245 that he first externally obtain clear medical proof of nonpaternity, stated:
We recognized in Fairrow that under certain extraordinary facts justice may require allowing subsequent access to the courts for reexamination of paternity, and we granted relief to Mr. Fairrow. At the same time, we observed the substantial disadvantages of allowing divorce litigants to use paternity as a tool in the frequently rambunctious atmosphere following the dissolution of a marriage. We advised that "one who comes into court to challenge a support order on the basis of non-paternity without externally obtained clear medical proof should be rejected. . . . "
The balance we struck in Fairrow does not represent a perfect solution. Still . . . [t]he relatively bright line we established there is one that could easily evaporate to the disadvantage of thousands of parents and children should it become riddled with exceptions.
Leiter v. Scott, 654 N.E.2d 742, 743 (Ind. 1995) (citation omitted). And, most recently, we clarified that "externally obtained" medical proof, as required by Fairrow, "means that the evidence establishing non-paternity was not actively sought by the putative father, but was discovered almost inadvertently in a manner that was unrelated to child support proceedings." Tirey v. Tirey, 806 N.E.2d 360, 363 n. 2 (Ind.Ct.App.2004), trans. denied (emphases added).
Here, the trial court, in its Order, expressly recognized that Black actively sought the genetic evidence of his nonpaternity after being told of the discussion between M.M.B. and A.W.T. That finding is supported by the record. The court then exercised its equitable discretion to provide Black relief under Rule 60(B)(8). But the court's finding that Black actively sought the DNA evidence to confirm or deny his suspicions of nonpaternity removed Black's requested relief from the court's equitable discretion. See K.M., 651 N.E.2d at 276. As such, the court clearly erred in vacating its prior judgments establishing Black's paternity over M.M.B. and A.W.T.
We note that, as in Pinter, the facts here are at least partially within the framework of Fairrow: Black presented clear, direct, and convincing medical evidence of his nonpaternity; Black obtained that evidence independently of court action; and, particularly unusual, Black presented evidence that M.M.B. and A.W.T. knew that they were not Black's biological children. See Pinter, 641 N.E.2d at 105. However, Black did not "stumble upon" the genetic evidence "inadvertently"; rather, he "actively sought" the evidence to address his "suspicions . . . that he many not have been [the children's] biological father." See Tirey, 806 N.E.2d at 363 n. 2; K.M., 651 N.E.2d at 274, 276; Pinter, 641 N.E.2d at 105. Again, under established Indiana law, it is clear that Black's request for relief under Trial Rule 60(B) was "outside the equitable discretion of the trial court." K.M., 651 N.E.2d at 276. We are therefore constrained to hold that the State has satisfied its prima facie burden of demonstrating that the trial court clearly erred in vacating Black's paternity of M.M.B. and A.W.T. and the accompanying support orders.
Reversed.
MATHIAS, J., and BRADFORD, J., concur.
NOTES
[1] The State correctly notes that the Indiana Code does not provide for the filing of an action to disestablish paternity and, further, that a trial court does not have the authority to treat child support proceedings as proceedings to disestablish paternity. See, e.g., In re Paternity of E.M.L.G., 863 N.E.2d 867, 869-70 (Ind.Ct.App.2007). However, those principles are not relevant here since Black neither sought relief from the paternity orders pursuant to a provision of the Indiana Code nor raised the issue of his paternity during a child support proceeding. Rather, the trial court held that Black was entitled to relief from the order establishing paternity under Trial Rule 60(B)(8) and that, as a result of that relief, Black's child support obligations should be discontinued. See, e.g., Fairrow, 559 N.E.2d at 599-600.